**Grady AUVIL et ux; et al., Plaintiffs,**

v.

**CBS "60 MINUTES"; et al., Defendants.**

**No. CS–90–553–RJM.**

United States District Court, E.D. Washington.

June 5, 1992.

Scott A. Jonsson and G. Kevin Kiely, Schwabe, Williamson & Wyatt, Portland, Or., J. Jarrette Sandlin and David H. Putney, Yakima, Wash., for plaintiffs.

Douglas P. Jacobs, Susanna M. Lowy and Anthony M. Bongiorno, CBS Inc., New York City, and Bruce E.H. Johnson, P. Cameron DeVore, and Christopher Pesce,

Davis Wright Tremaine, Seattle, Wash., for defendants CBS Inc., Retlaw Enterprises, Inc., d/b/a KIMA Television, Bonneville Intern. Corp., d/b/a KIRO Television, and King Broadcasting Co., d/b/a KREM Television.

Fred H. Altshuler, Stephen P. Berzon and Jeffrey P. Demain, Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, Cal., Peter D. Byrnes and Bradley S. Keller, Byrnes & Keller, Seattle, Wash., and Ted A. Roy, Roy & Pell, Yakima, Wash., for defendant Natural Resources Defense Council, Inc.

George A. Lehner and Kim Heebner Price, Pepper, Hamilton & Scheetz, Washington, D.C., and Eugene I. Annis, Lukins & Annis, P.S., Spokane, Wash., for defendant Fenton Communications, Inc.

## ORDER

WM. FREMMING NIELSEN, District Judge.

Currently pending is plaintiffs' motion to remand and defense motions to dismiss or in the alternative for summary judgment.

### I. Transactional Events

On February 26, 1989 the CBS television program "60 Minutes" aired a segment highly critical of daminozide, more commonly known by its tradename as Alar. Alar was commonly used in the apple industry as a growth regulator. By maintaining the fruit on the tree longer, cosmetic appearance is improved, fruit disorders are reduced, size is increased and storage life is enhanced. Various public interest groups, among them the Natural Resources Defense Council [NRDC], expressed concern over research which indicated that Alar chemically degrades into unsymmetrical dimethylhydrazine [UDMH], a carcinogen. Alar cannot be washed off the fruit, nor will peeling remove it. The substance remains in the flesh of the apple regardless of processing procedures.

The risk falls hardest on children who are the largest consumers of apple products. Based on these findings, the maxim "an apple a day keeps the doctor away" lost its appeal in the eyes of NRDC. "60 Minutes" investigated a report published by NRDC and centered a broadcast around those concerns narrated by Ed Bradley.[1] The credibility of the report was bolstered by an interview with the acting director of the Environmental Protection Agency, Dr. Moore. While minimizing the severity of risk, Dr. Moore confirmed that Alar was indeed a health hazard and noted that under today's rigorous certification standards, the chemical would not be approved for use.

"60 Minutes" did not employ the term "red apples," but the visuals accompanying the spoken word left no doubt that red apples constituted the subject matter.[2] Nor was Washington State referenced by name, although thanks to a longstanding aggressive marketing approach taken by the Washington State Apple Advertising Commission [WSAAC], it is commonly known throughout the country, if not the world, that Washington is the prime producer of red apples.

The toxicity or lack thereof of hydrazines such as UDMH in general and Alar in particular has been the subject of raging debate in scientific and environmental circles for many years. *Nader v. United States E.P.A.*, 859 F.2d 747, 749–50 (9th Cir.1988), *cert. denied*, 490 U.S. 1034, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989); *Renaud v. Martin Marietta Corp.*, 749 F.Supp. 1545, 1546–47 (D.Colo.1990). The striking "60 Minutes" presentation brought the controversy into the nation's living rooms and public reaction to the broadcast was dramatic and swift. Both sales and prices fell sharply, not only locally, but world-wide. Alar was taken off the market and after a vigorous educational campaign spearheaded by WSAAC, the industry eventually recovered. In the interim, growers and others dependent upon apple production sus-

---

1. The text of the broadcast is set out in full as an appendix.

2. The segment opens with a lengthy shot of a red delicious apple emblazoned with a skull and crossbones.

tained tremendous losses amounting to perhaps as much as $75 million dollars. Beyond immediate economic loss, growers forced into bankruptcy or work-out arrangements with lenders lost their homes and livelihoods. Those who survived intact saw their property values nosedive. Entire communities dependent upon the apple market were thrown into depression.

This suit followed. Styled as a class action brought on behalf of 4,700 Washington growers, it was filed in Yakima County Superior Court and thereafter removed. Named as defendants are "60 Minutes", CBS, three local CBS affiliates, KREM, KIRO and KIMA, as well as NRDC and Fenton Communications. The issues are two-fold: (1) does joinder of the local affiliates defeat diversity jurisdiction and thus require remand; and (2) if not, do plaintiffs have standing to maintain this action.

## II. Analysis

While various facts are in contention, it goes without saying that all matters in controversy are taken in the light most favorable to the non-moving parties.

### A. Remand:

It is undisputed that the affiliates exercised no editorial control over the broadcast. They had the power to do so by virtue of their contract with CBS. They in fact occasionally do censor programming when for one reason or another an affiliate believes the content unsuitable for local consumption; albeit, none had ever preempted "60 Minutes". In this case, however, all three merely served as a conduit. "60 Minutes" is aired nationwide at 7:00 p.m. on Sundays. To accommodate the time differential between the east and west coasts, the program is transmitted via satellite from New York to Los Angeles three hours prior to air time. Los Angeles then redistributes to stations on the west coast. The affiliates have both the right and the technical capability to access the broadcast during the three-hour hiatus. Also provided is a telexed communique setting out in general terms the nature of the subject matter. The local affiliates thus had some period of time in which to review programming and also some idea of the content. It is argued that these features, coupled with the power to censor, triggered the duty to censor. That is a leap which the Court is not prepared to join in.

With the possible exception of re-run movies, the content of which is already widely known and/or catalogued, plaintiffs' construction would force the creation of full time editorial boards at local stations throughout the country which possess sufficient knowledge, legal acumen and access to experts to continually monitor incoming transmissions and exercise on-the-spot discretionary calls or face $75 million dollar lawsuits at every turn. That is not realistic.

The rule in Washington remains that "a person who republishes defamatory statements made by another does not escape liability for the defamation even though the republisher is careful to ascribe the statements to the original speaker." *Herron v. Tribune Pub. Co.*, 108 Wash.2d 162, 178, 736 P.2d 249 (1987). The threshold inquiry is whether a local broadcaster who serves as a mere conduit "republishes" by relaying an unedited feed. The concept of republication is broad in this jurisdiction. See *LaMon v. City of Westport*, 44 Wash.App. 664, 668, 723 P.2d 470 (1986), *rev. denied*, 112 Wash.2d 1024 (1989), *cert. denied*, 493 U.S. 1074, 110 S.Ct. 1122, 107 L.Ed.2d 1029 (1990); *see also, Restatement (Second) of Torts* § 581 at *Comment g*. Accordingly, it will be assumed for purposes of disposition that the local affiliates did republish within the meaning of *Herron*. At the same time, however, there is no liability for any defamation absent fault. *LaMon v. Butler*, 112 Wash.2d 193, 197, 770 P.2d 1027, *cert. denied*, 493 U.S. 814, 110 S.Ct. 61, 107 L.Ed.2d 29 (1989).

The Washington approach is thus consistent with the general rule that there is no "conduit liability" in the absence of fault. *Lewis v. Time*, 83 F.R.D. 455, 463–64 (E.D.Cal.1979), *aff'd*, 710 F.2d 549 (9th Cir.1983). "One who only delivers or transmits defamatory material published by a third person is subject to liability if, but

only if, he knows or had reason to know of its defamatory character." *Dworkin v. Hustler Magazine, Inc.*, 634 F.Supp. 727, 729 (D.Wyo.1986) quoting *Restatement (Second) of Torts* § 581. While the above-cited decisions deal with liability vis a vis book sellers, there is no logical basis for imposing a duty of censorship on the visual media which does not likewise attach to the print chain of distribution. *Auvil v. CBS "60 Minutes"*, 140 F.R.D. 450, 451–52 (E.D.Wash.1991). *Cf., Cubby, Inc. v. CompuServe Inc.*, 776 F.Supp. 135, 139–40 (S.D.N.Y.1991) (computerized data library not responsible for passing on libelous statements absent fault). The sum total of what the affiliates knew prior to air time is set out below:

> A is For Apple—Ed Bradley reports on the inability of federal regulators [*sic*] eliminate known carcinogenic chemical sprayed on produce. (Shot in Seattle, Spokane; Minneapolis; Portland O.; Albany; Boston and Washington)

Upon reviewing that telex, the affiliates might well reason that the program would discuss apples and cancer. They might further conclude that the broadcast would be of significant local interest in Washington State. They might suspect also that apple growers would prefer the broadcast not be shown. There was not a hint, however, that the content would be defamatory. All defamatory material may be controversial, but the converse is not true.

More than merely unrealistic in economic terms, it is difficult to imagine a scenario more chilling on the media's right of expression and the public's right to know. *Auvil, supra*, 140 F.R.D. at 452; *see also, Lerman v. Flynt Dist. Co., Inc.*, 745 F.2d 123, 139 (2nd Cir.1984), *cert. denied*, 471 U.S. 1054, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985). Persons injured by defamatory material are not impaired by limiting conduit liability to those situations where culpability is established. The generating source, which in a national broadcast will generally be the deepest of the deep pockets, may still be called upon to defend.

Finally, it would be anomalous to impose different duties on broadcasters depending upon their geographic locations. An affiliate in Washington had three hours lead time. A station in Florida had none. A station in Iowa had one hour. Should varying obligations devolve upon each simply because of their physical situs?

Accordingly, summary judgment will be entered in favor of KREM, KIRO and KIMA and the claims asserted will be dismissed with prejudice. That results in complete diversity as among all remaining parties and the motion to remand will be denied.

### B. Product Disparagement vs. Defamation:

Disparagement and defamation are conceptually distinct torts. The latter deals with injury to the person; *i.e.*, reputation and character. *In re Valley Forge Plaza Assocs.*, 113 B.R. 892, 911 (Bkrtcy. E.D.Penn.), *aff'd in part and rev'd in part*, 120 B.R. 789 (E.D.Penn.1990). The former deals with pecuniary loss. *Id.* The distinction between the two has often proven troublesome from a semantical standpoint:

> "Trade libel," which has been defined by one California court as "an intentional disparagement of the quality of property, which results in pecuniary damage to plaintiff" is a confusing concept that has not been subjected to rigorous judicial analysis in California. The confusion arises primarily from uncertainty whether "trade libel" should be treated as a species of defamation, as all parties herein appear to believe, or instead constitutes the distinct tort of injurious falsehood, which "usually involves the publication of matter disparaging to the property in land, chattels or intangible rights or disparaging to their quality."

> \* \* \* \* \* \*

> As the Restatement points out, and as the commentators agree, the torts of injurious falsehood and defamation protect different interests and have entirely different origins in history. The action for defamation is to protect the personal reputation of the injured party; it arose out of the old actions for libel and slander.

The action for injurious falsehood is to protect economic interests of the injured party against pecuniary loss; it arose as an action on the case for the special damage resulting from the publication.

\* \* \* \* \* \*

Thus, despite the fact that what has come to be known as "trade libel" is similar to defamation in that both involve the imposition of liability for injuries sustained through publication to third parties of a false statement affecting the plaintiff, the two torts are distinct; that is, *"trade libel" is not true libel and is not actionable as defamation.*

*Polygram Records, Inc. v. Superior Court (Rege),* 170 Cal.App.3d 543, 548–49, 216 Cal.Rptr. 252, 254–55 (Cal.App.1985) (emphasis added, citations omitted), *cited with approval in Aetna Cas. & Sur. Co. v. Centennial Ins. Co.,* 838 F.2d 346, 351 (9th Cir.1988).

Because the conceptual underpinnings are distinct, it would not be surprising were the elements of proof different as well, and that is in fact the case. *Id.; see also, Zerpol Corp. v. DMP Corp.,* 561 F.Supp. 404, 408–09 (E.D.Pa.1983). Plaintiffs' argument is thus well taken that case law addressing defamation cannot always be bodily picked up and applied to disparagement. One must ask what rights were transgressed and what injury sustained. One must also look to the gloss placed on these two torts by state law.

That the elements are distinct, however, does not mean the law of defamation is irrelevant. Elements aside, there is one uniform federal standard founded on the First Amendment which will vitiate liability for publicity which might otherwise be defamatory or disparaging in nature:

> Unelko also argues that its claims for product disparagement, or "trade libel," and for tortious interference with business relationship were improperly dismissed. These claims, however, are subject to the same first amendment requirements that govern actions for defamation.

*Unelko Corp. v. Rooney,* 912 F.2d 1049, 1057–58 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1586, 113 L.Ed.2d 650 (1991).

■ Among the prophylactic rules designed to serve First Amendment values is the threshold requirement that the injured party demonstrate that the defamatory (or as here disparaging) communication was personally directed to him or (as here) to the product. *Rosenblatt v. Baer,* 383 U.S. 75, 81–82, 86 S.Ct. 669, 673–74, 15 L.Ed.2d 597 (1966). Known as the "of and concerning" principle, it requires a showing that the offending language pertains directly to a particular individual or product whose identity can be ascertained from the text (and context) of the publication. *Barger v. Playboy Enterprises, Inc.,* 564 F.Supp. 1151, 1153 (N.D.Cal.1983), *aff'd,* 732 F.2d 163 (9th Cir.1984), *cert. denied,* 469 U.S. 853, 105 S.Ct. 175, 83 L.Ed.2d 110 (1984).

■ Counsel concedes, as he must consonant with his duty of candor, that were this a defamation action, no single grower in the putative class could satisfy the "of and concerning" requirement:

> Plaintiffs do not claim that they, as individuals, were singled out in the 60 Minutes segment; rather, the group which they comprise—*the* major producer of red apples in the United States, was indisputably implicated in the program and harmed thereby.

Plaintiffs' Memorandum at 17 (emphasis original).

Growers were not referenced in the subject broadcast except in the most tangential sense.[3] The target was not the growers and no reasonable viewer would construe the broadcast in that manner. The target was agricultural use of hazardous substances with the emphasis on Alar. Because Alar physically merges with the

---

**3.** There was a reference to Mexican growers who actually sprayed their field hands with hazardous chemicals. There was also a reference to then-existing law requiring a balancing of the potential health hazard against the economic benefit to growers. That is the sum total of such references.

fruit, it was the apples which got hit. By derivation, so did the growers.

Plaintiffs contend that although no grower standing alone meets the "of and concerning" test, taken as a unit they do:

The accurate identification of the plaintiff herein distinguishes the myriad authorities relied upon by these defendants. In those cases, specific individual members of large groups claimed they were specially injured as a result of defamation leveled at the group. Here, the *group* claims that it is injured and seeks redress.

\*     \*     \*     \*     \*     \*

Contrary to the narrowly defined "plaintiff" urged by defendants, the true plaintiff herein is the Washington State red apple producing market, one of six major apple producing markets in the United States.

Plaintiff's Memorandum at 17–19 (emphasis original).

That is a good effort, but plays the game according to defendants' rules and leads inexorably into the semantical quagmire which *Polygram, supra,* cautions against. The individual/group dichotomy is not meaningful when disparagement is at issue. The case law on occasion reflects a tendency to gloss over the distinction between defamation and disparagement, and to treat the latter identically with the former. *See, e.g., National Nutritional Foods Ass'n v. Whelan,* 492 F.Supp. 374, 381 (S.D.N.Y.1980). Defendants point to such under-analyzed decisions for the proposition that because no grower was identified by name, the broadcast was not "of and concerning" any individual grower nor the group as a whole. That is no doubt true. The relevance of the observation, however, is elusive.

This case is not about personal defamation. The broadcast did not suggest that growers were evil or irresponsible or even incompetent. On the contrary, the use of Alar was a common agricultural practice and had been for more than two decades. To the extent that moral culpability was even hinted at, the target was the government which was aware of the risks but

declined to cancel the Alar registration and took only minimal steps to reduce allowable exposure. See *Nader, supra,* 859 F.2d at 749–50. Thus, the fact that no grower was identified seems an idle point. Plaintiffs are not suing because they were defamed. They are suing because their product was disparaged. Suppose hypothetically that the following bit had been part of the broadcast segment.

[Camera pans small orchard, coming to rest on a farm house.]

Voice over: Grady Auvil and his family have called this home for twenty years. That is them standing in the front yard.

Bradley: Mr. Auvil, we spoke by phone earlier about the Alar controversy. Would you like to share your thoughts with our viewers?

Auvil: Yes, Ed. I've read the NRDC report and I'm just sick. Not only because of the economic impact adverse publicity might have on my family and this entire region, but because for twenty years I figured I was raising a wholesome product and it turns out I've been giving kids cancer. All with the blessings of the United States government.

With a specific grower now identified, can it be said that Mr. Auvil meets the "of and concerning" test? No doubt. But consider what result if that bit were followed by the colloquy hypothesized below:

[Camera pans apple packing facility. Bradley and Auvil are walking through the building].

Bradley: Wow, that's a lot of apples. Grady, would you point out yours?

Auvil: Can't do that Ed. Some of these apples are mine, but apples aren't like cattle. We don't brand them at the orchard.

Bradley: So when you and possibly a hundred other small growers bring your apples here they're just lumped altogether? You can't tell which ones are yours?

Auvil: Nope.

Bradley: You agree that your apples constitute a health hazard. How do we tell the difference between a carcinogenic apple and a safe one?

Auvil: You can't.

Bradley: Assume you are one of a hundred growers in the valley. No one else uses Alar. Only you. What are the odds that this apple I am picking up is carcinogenic? One percent?

Auvil: Simple math.

Bradley: But you're not the only grower in the valley who uses Alar, are you?

Auvil: Nope.

Leaving hypotheticals behind, that was the ultimate message of the broadcast. No grower was identified by name, but it was clear that at least some growers must be using Alar because more than 70% of the samples tested contained daminozide, and levels were unacceptably high 15% of the time. Lest anyone miss the point, Dr. Groth of the Consumers Union emphasized the universal nature of the hazard with his "supermarket roulette" comment:

Bradley: So when a parent goes to the grocery store looking for an apple product that does not contain daminozide, how do you do that?

Dr. Groth: It's a supermarket roulette. You don't know. The consumer can't tell by looking at the [apple juice] bottle whether it's got daminozide in it or not, and unfortunately, the consumer can't tell by depending on the manufacturer's assurance that they're using daminozide-free apples, because we've shown that isn't valid in all cases.

The broadcast was clearly "of and concerning" daminozide-laced apples. More broadly yet, it was "of and concerning" all apples whether treated with Alar or not. To the extent that identification of growers is relevant at all, every apple grower in the country was identified. Their products were identified as dangerous regardless of whether the fruit had been exposed to Alar.[4]

### C. Group Libel:

Counsel have not cited, and the Court has not found, a case holding that group libel does not apply to disparagement claims. A few decisions have been located which arguably (albeit sub silentio) hold to the contrary. *See, e.g., Whelan, supra,* 492 F.Supp. at 381. There is room to question whether the group libel doctrine finds application in a disparagement action. Two theories underlie the concept.

The first is that of dilution. *Brady v. Ottaway Newspapers, Inc.,* 445 N.Y.S.2d 786, 788–89, 84 A.D.2d 226, 228–230 (N.Y.A.D.1981). If a class is sufficiently broad, no one member really suffers personal injury. For example, the slur "all lawyers are shysters" may be offensive to those lawyers who are not, but no attorney could reasonably complain that he personally has sustained damage to his character and reputation by operation of such a vacuous generality. *Michigan United Conservation Clubs v. CBS News,* 485 F.Supp. 893, 898–99 (W.D.Mich.1980), *aff'd,* 665 F.2d 110 (6th Cir.1981); *see also, Khalid Abullah Tariq Al Mansour Faissal Fahd Al Talal v. Fanning,* 506 F.Supp. 186 (N.D.Cal.1980) (class of 600 million Muslims cannot claim each member defamed). In a disparagement action where pecuniary interests are at stake, there is no dilution. It would matter not a whit whether all of the apple orchards in the state were owned by a single corporation or, as here, by thousands of "ma and pa" operations. The injury would be the same. The injury is

---

4. Which takes the case out of the rule of *California Canners & Growers Ass'n v. United States,* 7 Cl.Ct. 69 (1984). That decision involved a governmental ban on cyclamates. The chemical was used in a vast panoply of food products. No one had an unkind word for the products, only the cyclamates. The Court thus noted the general rule that derogatory publicity directed only to the chemical and not the products would fail the "of and concerning" test. *Id.* at 86 & 118. Here, not only were apples specifically referenced, but *all* apples were targeted as suspect even if Alar-free. Plaintiffs represent that only about 10% of Washington apples were treated with Alar during the relevant time frame. That is not inconsistent with NRDC estimates.

merely distributed among a larger universe.[5]

■ The second theory involves identification. When an entire class is defamed, it is usually difficult to show that class-wide allegations could be said to be directed to each individual. *See, e.g., Schuster v. U.S. News & World Report, Inc.,* 602 F.2d 850, 854 (8th Cir.1979). Thus, the general rule is that either: (1) the class must be small enough so that the derogatory communication may be reasonably understood to apply to each class member; or (2) the circumstances of the publication reasonably suggest that some particular member was targeted. *Sims v. KIRO,* 20 Wash.App. 229, 236, 580 P.2d 642, *rev. denied,* 91 Wash.2d 1007 (1978), *cert. denied,* 441 U.S. 945, 99 S.Ct. 2164, 60 L.Ed.2d 1047 (1979). While universally accepted and applied in defamation actions, the concept does not mesh neatly with disparagement theory. True, "every apple in the United States" is a fair sized class, but for reasons addressed *supra,* the broadcast clearly targeted every apple in the United States *whether it was treated with Alar or not.* Certainly, that is how the consuming public viewed the broadcast judging from the dramatic decline in demand. See *United Medical Laboratories v. Columbia Broadcasting System,* 404 F.2d 706, 708–09 (9th Cir.1968) (post-publicity effect on business probative of whether unidentified class member impugned), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969). This is not a case of generalization where "all lawyers are shysters" or "all hunters are cruel." The message "apples give kids cancer" sounds an explicit, particularized and unmistakably concrete alarm to the consuming public to run, not walk, away from that apple stand.

The doctrine of group libel has obvious utility in the defamation arena as evidenced by its universal endorsement. A parallel rule may be useful in disparagement actions provided that one of the goals of the doctrine is served thereby; for example, if the product actually disparaged is not sufficiently identified or if injury is in fact diluted. Blindly applying the concept to all disparagement cases, however, would be tantamount to counseling potential disparagors that they are home free if only they succeed in wreaking damage on a sufficient number of manufacturers.

### D. The New York Times Standard:

■ In the defamation context, the general rule is that if the defamee is a public figure, the burden of proof shifts to the plaintiff and is greatly heightened. Not only must the objectionable statement be proven false, but it must have been made with actual malice. *New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 225–26, 11 L.Ed.2d 686 (1964). That is a stout standard requiring either willfulness or at least reckless disregard for the truth. *Id.* Even substantial truth will defeat allegations of falsity. *Unelko, supra,* 912 F.2d at 1057. In Washington, the public/private figure distinction becomes less relevant. The burden of proof is always on the plaintiff, and in the case of a media defendant, the burden of establishing fault must be met by clear and convincing evidence. See *LaMon, supra,* 112 Wash.2d at 197–98, 770 P.2d 1027; *see also, id.* at 205, *et seq.,* 770 P.2d 1027 (Utter, J., dissenting).

■ Some courts have applied the same rule in the disparagement context if the subject matter is of grave public concern. See *Whelan, supra,* 492 F.Supp. at 382. The validity of that proposition is an open question in Washington. See *LaMon, supra,* 112 Wash.2d at 198, 770 P.2d 1027. It would be difficult to conceive of an issue of greater public import than the presence of carcinogenic substances in the nation's food supply. *Cf., Unelko, supra,* 912 F.2d at 1056. That would seem particularly so when the largest segment of consumers consists of children. The same result has obtained when the manufacturer is deemed a public figure. *Bose Corp. v. Consumers*

---

**5.** For example, suppose the broadcast occurred just as it did but instead of apples, the subject was pineapples. While the grower is not identified, the public can hazard a decent guess as to who it is. Why the Dole Pineapple Company should escape the group libel rule but the plaintiffs in this action should not lacks a ready answer.

*Union of U.S., Inc.,* 466 U.S. 485, 489–90, 104 S.Ct. 1949, 1953–54, 80 L.Ed.2d 502 (1984).

■ Questions of public interest and public figure aside, the necessity of establishing both falsity and scienter or recklessness is the general rule in disparagement actions.[6] *Restatement (Second) of Torts* § 623A(b); *Ruder & Finn Inc. v. Seaboard Sur. Co.,* 52 N.Y.2d 663, 670–71, 439 N.Y.S.2d 858, 862, 422 N.E.2d 518, 522 (1981). These stringent burdens pre-existed *New York Times* at common law. W. Prosser, *The Law of Torts,* § 128, p. 920 (4th ed. 1972). Those burdens are probably constitutionally required. *Simmons Ford, Inc. v. Consumers Union of U.S., Inc.,* 516 F.Supp. 742, 744 n. 4 (S.D.N.Y.1981); *Blatty v. New York Times Co.,* 42 Cal.3d 1033, 1043, 232 Cal.Rptr. 542, 548, 728 P.2d 1177, 1183 (1986), *cert. denied,* 485 U.S. 934, 108 S.Ct. 1107, 99 L.Ed.2d 268 (1988); *see also,* § 623A at *Comment d.* Moreover, although case law on point is sparse, it would appear from such meager guidance as is available that Washington recognizes the increased burden faced by one whose product is disparaged but whose reputation is not defamed. *Waechter v. Carnation Co.,* 5 Wash.App. 121, 126–27, 485 P.2d 1000 (1971).[7]

Accordingly, plaintiffs will be required to establish their case in compliance with the *Restatement* standard. While the instant motions address the broad panoply of libel and disparagement concepts, falsity and malice are not among them. Presumably, discovery remains to be accomplished prior to framing the issues.

THEREFORE IT IS ORDERED that:

(1) Motions for summary judgment brought by KREM, KIRO and KIMA are GRANTED.

(2) Plaintiffs' motion to remand is DENIED.

(3) The motion of CBS and CBS "60 Minutes" to dismiss or in the alternative for summary judgment is DENIED.

(4) The motion of NRDC and Fenton Communications raises a far closer question as to whether the "of and concerning" requirement has been met and will be addressed in a separate Order.

(5) The public interest is best served by expeditious disposition of cases raising First Amendment issues. *Dorsey v. National Enquirer, Inc.,* 952 F.2d 250, 254 (9th Cir.1991); *Mark v. Seattle Times,* 96 Wash.2d 473, 484–87, 635 P.2d 1081 (1981), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2942, 73 L.Ed.2d 1339 (1982). The laggardly pace which has characterized this action thus far should not continue. The parties will be given ninety days in which to make further discovery on the falsity and malice issues. Discovery will be confined solely to that context and counsel will be expected to offer one another maximum cooperation in meeting this schedule. At the conclusion of ninety days, renewed motions may be filed and they will be heard and decided as quickly as the parties can be ready.

## APPENDIX

### "A" Is For Apple

**BRADLEY**: The most potent cancer-causing agent in our food supply is a substance sprayed on apples to keep them on the trees longer and make them look better. That's the conclusion of a number of scientific experts. And who is most at risk? Children, who may someday develop cancer from this one chemical called daminozide. Daminozide, which has been sprayed on apples for more than 20 years, breaks down into another chemical called UDMH.

*[voice-over]* The EPA's acting administrator, Dr. Jack Moore, acknowledged that the EPA has known about the cancer risk for 16 years.

---

**6.** Which probably explains why plaintiffs continue to urge a "group defamation" theory rather than squarely characterize the action as what it is; a products disparagement case.

**7.** *Waechter* is no longer good law for its treatment of defamation. *See generally, LaMon,* supra, 112 Wash.2d at 197–98, 770 P.2d 1027 (prevailing elements and standards). The decision is cited only for the proposition that even when defamation could be established under the more relaxed criteria of yesteryear, the tort of disparagement was viewed with greater stringency.

**Dr. JACK MOORE:** There's no question if it was a new chemical, not yet on the market, and it was brought to the agency to be evaluated, that it would not get on the market, based on the data that was available.

**BRADLEY:** Dr. Moore, I can't understand that. I mean, you're telling me something—that if this stuff came to you today, and it was brand new, it wouldn't get on the market, but because it's already out there, we can keep using it? That doesn't make sense to me.

**Dr. MOORE:** You've just identified one of the paradoxes of the statute. Once a pesticide gets its license, gets its registration, is on the market, despite what everybody what might think, the burden of carrying unreasonable risk finding basically goes on to the government. All right?

**BRADLEY:** But you see, a lot of these chemicals—

**Dr. MOORE:** Prior to that—

**BRADLEY:** —got on the market when we didn't know that they were cancer-causing agents.

**Dr. MOORE:** —yes, you're correct.

**BRADLEY:** And they're on the market now. We know that they do cause cancer.

**Dr. MOORE:** Correct.

**BRADLEY:** But you say we can't take them off because they're already on the market, and they went on the market when we didn't know they caused cancer.

**Dr. MOORE:** That's the paradox of the statute.

**BRADLEY:** That's crazy!

**Dr. MOORE:** We ought to change the statute.

**BRADLEY:** Is it fair to say, then, Dr. Moore, that there are laws on the books that are putting all of us—particularly our children—at risk?

**Dr. MOORE:** Could be. Could be.

**BRADLEY** *[voice-over]:* While Dr. Moore blames a law, which requires him to balance the health risk to the public against the economic benefits to the growers, Congressman Jerry Sikorsky blames the EPA.

**Rep. JERRY SIKORSKY:** They have two laws. One is the Food and Drug and Cosmetic act that says quite clearly if this—if this chemical causes tumor in laboratory animals—not malignant tumors, any kind of tumors—it's supposed to be pulled off the market.

**BRADLEY:** Jack Moore, the deputy administrator of the EPA, says that he'd like to take it off the market, but he's afraid that the manufacturer, Uniroyal, that makes this chemical, could successfully sue the EPA if he did so.

**Rep. SIKORSKY:** So let them sue. That's his job. He's with the Environmental Protection Agency. Go to a cancer ward at any children's hospital in this country. See these bald, wasting-away kids. And then make a decision as to whether the risks balance over the benefits.

**BRADLEY** *[voice-over]:* Kids are at a high risk from UDMH because they drink so much apple juice. The average preschooler drinks 18 times more apple juice than his or her mother. If those apples were treated with daminozide, the cancer risk is perilously high. Janet Hathaway is a senior attorney for the Natural Resources Defense Council.

**JANET HATHAWAY:** What we're talking about is a cancer-causing agent used on food that EPA knows is going to cause cancer for thousands of children over their lifetime.

**BRADLEY** *[voice-over]:* Uniroyal Chemical, which makes daminozide under the trade name Alar, declined to be interviewed for this report. But in a letter they said "... any risk from daminozide or UDMH, if it exists, is negligible." Nonetheless, preliminary results from Uniroyal's own study already show high levels of cancer in laboratory animals. Janet Hathaway's organization, the Natural Resources Defense Council, has just completed the most careful study yet on the effect of daminozide and seven other cancer-causing pesticides on the food children eat.

**Ms. HATHAWAY:** Just from these eight pesticides, what we're finding is that the

risk of developing cancer is approximately 250 times what EPA says is an acceptable level of cancer in our population.

**BRADLEY:** Two hundred fifty times?

**Ms. HATHAWAY:** That's right. What that means is that over a lifetime, one child out of every 4,000 or so of our preschoolers will develop cancer just from these eight pesticides.

**BRADLEY:** And the EPA says acceptable limit is one out of—

**Ms. HATHAWAY:** One out of a million, they say, is acceptable.

**BRADLEY:** Are they scaring people needlessly? Are they fearmongers?

**Dr. MOORE:** Well, there's no question, if the risk is greater than the one in a million calculation, it's a cause for concern to this agency.

**BRADLEY:** Now, you've had a chance to look at the NRDC study. It says children are being exposed to a pesticide risk several hundred times greater than what the agency says is acceptable.

**Dr. MOORE:** Risk unacceptable, yes. The magnitude of risk is less by our calculation than apparently they calculate.

**BRADLEY** *[voice-over]:* Dr. John Graef, a professor of pediatrics at Harvard Medical School, also reviewed the study by the Natural Resources Defense Council.

**Dr. JOHN GRAEF:** I think that, by and large, the basis of the report is sound. I think the principles it's based on are very sound, which is that children clearly are subject to very large exposures to these chemicals, that they are at significant risk, that they are at greater risk than our adults. I may quibble a little bit with the calculations, but that quibbling doesn't get away from the basic point, that the FDA regulations or the FDA surveillance and the EPA regulations are not addressing the danger to children.

**BRADLEY** *[voice-over]:* The FDA, the Food and Drug Administration, is supposed to monitor pesticide residues in our food, including residues of the apple spray UDMH.

*[interviewing]* Do you have any idea on which vegetables, which products, which fruits have been tested in the last couple of years for UDMH?

**Dr. MOORE:** Well, we have that—that data. I don't have it all on my fingertips.

**BRADLEY:** Two jars of grape jelly, one piece of cherry candy. That's not very reassuring.

**Dr. MOORE:** Well, the data speak for themselves. Ed, there's no question that the level of resource that's available to FDA does not allow one to have a meaningful presence every day on every commodity.

**BRADLEY** *[voice-over]:* Some of the danger from pesticides comes from growers outside the U.S. who ignore pesticide laws altogether. Here's one in Mexico who was caught spraying toxic chemicals on his own workers. Bad for the workers, and hardly reassuring for us, considering that most of our winter vegetables come from Mexico. And what kind of job is the Food and Drug Administration doing to ensure that pesticide-contaminated food doesn't reach us? We went to the border checkpoint in Laredo, Texas, with Congressman Sikorsky.

*[interviewing]* What's the likelihood that if one of those loads contains pesticides that are actually banned in the United States, that the FDA is going to catch it right here at the border?

**Rep. SIKORSKY:** Almost nil. Nothing. Zip.

**BRADLEY** *[voice-over]:* Congressman Sikorsky's committee held hearings on how the FDA monitors pesticide residues.

*[interviewing]* If they do flag someone and decide that they want to make a test, how long does it take to find out if there's a problem?

**Rep. SIKORSKY:** The average in our hearing in '87, we found out, was 28 days.

**BRADLEY:** Twenty-eight days?

**Rep. SIKORSKY:** Twenty-eight days. Now it's down to maybe two to three weeks. And by then this fresh produce is likely to have been already stocked and consumed.

BRADLEY *[voice-over]:* We looked for the food and drug inspector at this border crossing, but he was nowhere in sight. That's not surprising. One FDA agent is supposed to monitor four separate border crossings, spread over 400 miles. And if that's not bad enough, the FDA's routine tests for pesticide residues don't even pick up half of the most dangerous ones.

One of the cancer-causing pesticides the FDA's routine test doesn't pick up at all is benamil.

*[interviewing]* Of the 50 or 60 billion pounds of bananas that came into the United States over an eight-year period, do you know how many bananas the FDA sampled for the carcinogenic pesticide that's known as benamil?

Dr. MOORE: Not specifically, but my—having sat through Senate testimony early in the year, I think the answer might be one.

BRADLEY: Two.

Dr. MOORE: Two.

BRADLEY: Two. Not two boatloads, two truckloads, two bunches. Two bananas. Are you comfortable with that?

Dr. MOORE: I would certainly like to see greater sampling for benamil in this case.

BRADLEY *[voice-over]:* Like benamil on bananas, daminozide on apples can't be washed or peeled off. When apples are processed, say for apple juice or apple sauce, daminozide quickly turns into UDMH, a more dangerous chemical which—believe it or not—is also rocket fuel.

Just two weeks after we first interviewed him, the EPA's Dr. Moore took another look at the evidence and decided to start the process of banning daminozide after all. But that process could take five years. So we returned to Washington to ask him why he doesn't just declare daminozide an imminent hazard, and suspend it right away, which the law does allow him to do.

*[interviewing]* If the risk is unacceptable, by your own admission, you have the authority, under the law today, to make it and declare it an imminent hazard and get rid of it.

Dr. MOORE: In rare instances you might have a risk that is so provocative that you do not want to allow this chemical to stay on—in use during the period of the cancellation process. They then allow for suspension action. In our opinion, the—the data that we have in hand is not sufficiently provocative to allow us to make that suspension finding.

BRADLEY: I'm not a scientist, but if you're telling me that this stuff is 50 times more dangerous, the levels are 50 times higher than what you say is acceptable, that says to me that's a problem, Dr. Moore. That says to me that if we are protecting the environment, protecting us, you take it off.

Dr. MOORE: Ed, we aren't debating whether or not there's a problem here. What we're debating is the pace by which one should get it off the market. We have concluded that it's a problem, it should come off the market. We think under the existing law, the—the avenue that's available to us is through a normal cancellation as opposed to an accelerated suspension.

Ms. HATHAWAY: If EPA doesn't think that the most potent cancer-causing chemical in our food supply is grounds enough to declare an imminent hazard and remove it from food, well, I don't know what kind of risk it takes, then, to declare a chemical an imminent hazard.

BRADLEY: From the time the first red flag went up, it will have taken 19 years to get this stuff off the market and out of the food supply.

Dr. MOORE: That's correct, based on the original studies back in the '70s.

Ms. HATHAWAY: They have the opportunity to suspend the use of the chemical today, if they want to do it. And they're not doing it. Instead, they're telling us that maybe over a few years they'll slowly ease this out of the food supply.

BRADLEY: How much daminozide is still in the food supply? The last time the government checked, in 1986, it was in 80

percent of processed apple products. Since then, most food processors say they no longer use apples treated with daminozide. Well, this week we spoke to Consumers Union, which publishes *Consumer Reports* magazine. They had a laboratory analyze 32 samples of apple juice that were on the market last year. Consumers Union scientist Dr. Ned Groth says there is less daminozide than there was three years ago, but there's still plenty out there.

**Dr. NED GROTH:** Out of 32 samples we analyzed, five had significantly higher levels of daminozide than you would have thought, and two-thirds of them had some daminozide. Only nine out of 32 had no detectable daminozide.

**BRADLEY:** Did you find daminozide in any of the products whose manufacturers claim they no longer use daminozide-treated apples?

**Dr. GROTH:** Yes. All of the products that we found daminozide in were from manufacturers who had made that statement to use previously, that they don't use daminozide-treated apples.

**BRADLEY:** So after they told you they don't use it, you studied their products.

**Dr. GROTH:** What our tests show is that manufacturers who have made that promise are not succeeding at keeping daminozide out of their products. Not all manufacturers, but some are not succeeding.

**BRADLEY:** So when a parent goes to the grocery store looking for an apple product that does not contain daminozide, how do you do that?

**Dr. GROTH:** It's supermarket roulette. You don't know. The consumer can't tell by looking at the bottle whether it's got daminozide in it or not, and unfortunately, the consumer can't tell by depending on the manufacturer's assurance that they're using daminozide-free apples, because we've shown that isn't valid in all cases.

*[Commercial break]*