## MERCO JOINT VENTURE

v.

## Hugh B. KAUFMAN, et al.

### No. P–94–CA–55.

United States District Court,
W.D. Texas,
Pecos Division.

March 14, 1996.

Joseph Tydings of Anderson, Kill, Olick & Oshinsky, Washington, D.C., for plaintiff.

Dan Davison of Fulbright & Jaworski, Dallas, TX, for defendants.

## FIRST ORDER ON MOTIONS FOR SUMMARY JUDGMENT

BUNTON, Senior District Judge.

**BEFORE THE COURT,** in the above-captioned cause of action, are two separate motions for summary judgment. The first motion is by Defendant Tri–State Broadcasting and the second motion is by Defendants TriStar Television, Inc., Tri–State Broadcasting, and Roy Sekoff. Also on file and before the Court are Plaintiff Merco Joint Venture's responses, and various and sundry replies, letter briefs, and objections from both parties. After due consideration of the facts and law in this case, the Court makes the following determination:

### BACKGROUND

This is an alleged libel and business disparagement action filed by Plaintiff Merco Joint Venture ("Merco") against a number of Defendants, one of which is Tri–State Broadcasting ("Tri–State") the owner of KTSM TV–9 television station located in El Paso, Texas. Merco was formed for the purpose of performing a contract with the New York City's Department of Environmental Protection for receiving, processing, and disposing of New York City wastewater. After processing the wastewater and forming biosolids or what has been commonly referred to as "wastewater treatment sludge," Merco then ships the sludge by rail to Sierra Blanca, Texas to a rangeland owned by Merco and referred to as the "Merco Project." Once the sludge arrives, it is then applied as fertilizer to the rangeland.

On approximately August 2, 1994, Tri–State, in its capacity as the El Paso affiliate of the National Broadcasting Company ("NBC") broadcast a summer replacement show entitled "TV Nation." The particular segment in dispute before this Court was entitled "Sludge Train." The Sludge Train segment described the Merco Project and examined the controversy surrounding the project by interviewing, inter alia, residents of Sierra Blanca and Merco Project employees. Merco then filed suit against Defendants alleging libel and business disparagement based upon the treatment Merco received on "TV Nation." Tri–State pres-

ently moves for summary judgment pursuant to Texas Civil Practices and Remedies Code § 73.004 and Merco's failure to demonstrate that Tri–State acted with actual malice.

## STANDARD OF REVIEW

Summary judgment, "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *see Hansen v. Continental Ins. Co.*, 940 F.2d 971, 975 (5th Cir.1991); *Hogue v. Royse City*, 939 F.2d 1249, 1252 (5th Cir.1991). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting FED.R.CIV.P. 1).

"All facts contained in the pleadings, depositions, admissions, and answers to interrogatories are reviewed by 'drawing all inferences most favorable to the party opposing the motion.'" *James v. Sadler*, 909 F.2d 834, 836 (5th Cir.1990) (quoting *Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986)); *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 474 (5th Cir.1989); *Moore v. Mississippi Valley State Univ.*, 871 F.2d 545, 549 (5th Cir.1989); *Degan v. Ford Motor Co.*, 869 F.2d 889, 892 (5th Cir.1989). However, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190–91 (5th Cir.1991).

Accordingly, the focus of this Court is upon disputes over material facts; that is, only facts likely to affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir.), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 107 (1987). The Fifth Circuit has stated, "[t]he standard of review is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon the record evidence before the court." *James*, 909 F.2d at 837; *see Matsushita Elec. Industr. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc).

Rule 56(c) does not "require[ ] that an oral hearing be held on a motion for summary judgment." *McMillian v. City of Rockmart*, 653 F.2d 907, 911 (5th Cir.1981); *see* FED. R.CIV.P. 78; Local Court Rule CV–7(h). However, this Court has demonstrated its willingness to allow a nonmoving party a day in court in borderline cases where, under the governing law or reasonable extensions of existing law, the hearing of some testimony would be helpful to understanding the proper application of the law. Such is not the situation in the case at bar.

## DISCUSSION

### I. TEXAS CIVIL PRACTICES AND REMEDIES CODE § 73.004

Tri–State Broadcasting argues in its motion for summary judgment that local television stations, such as KTSM TV–9, which merely broadcast a program "feed" from a network source, without knowledge that the information contained therein is false, cannot be held liable for defamation. Tri–State argues the applicable statute in the civil remedies code is the following:

§ 73.04. Liability of Broadcaster

(a) A broadcaster is not liable in damages for a defamatory statement published or uttered in or as a part of a radio or television broadcast by one other than the broadcaster unless the complaining party proves that the broadcaster failed to exer-

cise due care to prevent the publication or utterance of the statement in the broadcast.

TEX.CIV.PRAC.REM.CODE ANN. § 73.004 (Vernon's 1995). Tri–State supports its argument by citing *Auvil v. CBS "60 Minutes"*, 800 F.Supp. 928 (E.D.Wash.1992) a case which stands for the proposition that "[o]ne who only delivers or transmits defamatory material published by a third person is subject to liability if, but only if, he *knows or had reason to know* of its defamatory character." *Id.* at 631–32 (citing *Dworkin v. Hustler Magazine, Inc.*, 634 F.Supp. 727, 729 (D.Wyo.1986) (emphasis supplied)). Though this is a correct recitation of the law in the State of Washington, which does not have a liability of broadcaster statute, the law in Texas does not ascribe to the "knew or had reason to know standard." On the contrary, Texas has a negligence standard for showing liability—that of ordinary (or due) care.

Although section 73.004 has been on the books for some time, both parties concede to the Court the absolute dearth of case law interpreting the statute. This Court has located statutes in other states which are similar to Texas' liability of broadcaster statute, yet has been unsuccessful in finding case law on point interpreting the respective statutes. *See* KY.REV.STAT.ANN. § 411.062; MICH.STAT. ANN. § 484.331; OHIO REV.CODE ANN. § 2739.03; WIS.STAT.ANN. § 895.052; WYO. STAT. § 1–29–101. Nevertheless, this Court is convinced that the proper application of section 73.004 in the present case mandates the granting of summary judgment for this particular Defendant. A closer look at section 73.004 requires that there be a finding of defamation before the defense[1] of ordinary care afforded by section 73.004 can be used. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 73.004. However, before a finding of defamation can be made this Court must determine whether Merco is considered a private or public figure

in order to apply the proper summary judgment standard.

### a. Limited Purpose Public Figure

In *Gertz v. Robert Welch, Inc.*, the Supreme Court outlined three approaches for determining whether a person or entity can be construed as a public figure for purposes of applying the proper summary judgment standard:

> [I]t may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society.... More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event they invite attention and comment. Even if the foregoing generalities do not obtain in every instance, the communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.

418 U.S. 323, 345, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974). In this Court's opinion, Merco meets the requirements of the *Gertz* test by virtue of its public relations campaigns both in Sierra Blanca and West Texas. For example, the Merco Project funded a 1.5 million dollar independent study by Texas Tech University regarding the safe application of wastewater treatment sludge on rangeland to allay any concerns by the public.[2] Furthermore, Merco held press conferences, sent invitation via the mail to Sierra Blanca residents for an open house, and free bus tours of the Merco Project site prior to the application of the sludge, all in an attempt to spread both information and good

---

**1.** District Courts have found that "the so-called 'defense' is actually a definition of ordinary care in regard to the use of wire services stories." *O'Brien v. Williamson Daily News*, 735 F.Supp. 218, 220 (E.D.Ky.1990). This Court is of the opinion that the wire service defense and the liability of broadcaster defense are correlative enough to be used interchangeably.

**2.** Although this Court has absolutely no opinion in this regard, it does recognize that the application of New York City sludge on rangeland in West Texas has created some public controversy among persons in that geographic region.

will among the residents of West Texas. While these gestures are certainly laudatory, they are not the actions of an entity that wishes to remain anonymous or private and therefore qualify Merco as a limited purpose public figure. Since Merco is considered a limited purpose public figure, the standard for defamation, which incidentally is a generic label describing either libel or slander, is that put forth by the New York Times Rule.

### b. New York Times Rule

In *New York Times Co. v. Sullivan,* the United States Supreme Court held that the First Amendment to the United States Constitution precludes public officials from recovering damages for defamatory statements relating to their official conduct unless they can prove that the defendant made the statements with actual malice. 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). The Supreme Court defined actual malice in *New York Times* as knowledge that the statement was false or reckless disregard as to whether or not it was false. *Id.* at 280, 84 S.Ct. at 726. Moreover, the protection recognized by the Supreme Court in *New York Times* was extended to cover public figures, as well as public officials in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967).

It is with the rule stated above that this Court determines Tri–State's actions to be without actual malice. In the response filed by Merco on September 21, 1995, Merco argues that Tri–State knew or should have known that the broadcast was going to be false based on KTSM's periodic news reports dating from 1992, the year of a civil action involving Merco and tried by this Court. *See State v. Furgeson,* No. P–92–CA–17 (W.D.Tex. Dec. 7, 1992). The mere investigative reporting of the Merco Project over a period of years from 1992, which has been an ongoing controversy in West Texas since its inception, is insufficient evidence to prove that KTSM knew or should have known that the TV Nation segment aired on August 2, 1994 would be false.

Merco further argues that a showing of actual malice on the part of Tri–State is evident based on a "live at five" telephone interview with producer Michael Moore con-

ducted by reporter Raymond Mesa on August 2, 1995, the day TV Nation was to air. Kevin Lovell, the news assignment editor for KTSM, attempted to contact Michael Moore to interview him based on a TV listing for his show that evening dealing with "Sierra Blanca's sludge farm." *See Letter Brief* at A–1 (filed Oct. 4, 1995). Mr. Moore was then interviewed by Mr. Mesa who asked:

> Mesa: Are you gonna do a hatchet job on this, or what, what is the angle you're gonna take?
>
> Moore: Uh, well, which, where do you think the hatchet is gonna fall?
>
> Mesa: I don't know, that's what I'd like to find out.

*See Exhibit A to the Sybert Declaration.* Mr. Mesa did not know what the segment was going to say and could not have known based on the information KTSM had at the time. Moreover, the third party paraphrases by Mr. Moore of an EPA official's opinion that the Merco Project "violated federal standards" was not sufficient evidence to warrant Mr. Mesa, or anyone at KTSM, to do an independent investigation.

The responsibility of a local affiliate such as KTSM to do independent research on a program "feed" from a network source is a difficult question for this Court, and although inapplicable for purposes of section 73.004, the case of *Auvil v. CBS "60 Minutes"* mentioned above is nonetheless insightful for determining the amount of responsibility KTSM had in the hours prior to airing TV Nation.

### c. *Auvil v. CBS "60 Minutes"*

On February 26, 1989, the CBS news program "60 Minutes" aired a segment in which correspondent Ed Bradley investigated a growth regulator commonly known as Alar. When applied on apple trees, Alar maintained the fruit on the tree longer, improved both the size and cosmetic appearance of the fruit, reduced fruit disorders, and increased the storage life of the fruit. The segment, however, concentrated on the Natural Resources Defense Council's efforts to brand Alar as carcinogenic to humans. The report was supported by an interview with the acting director of the Environmental Protection

Agency who confirmed that Alar was a health hazard.

Subsequently, 4,700 Washington State apple growers filed a class action law suit against CBS, "60 Minutes," and three local CBS affiliates located in Washington. The District Court found that there was a three hour time zone difference between the East Coast where "60 Minutes" was broadcast and the West Coast where the local affiliates republished the network feed. The District Court also found that the local affiliates were provided with a telexed communique setting out the subject matter of the segment for that evening's broadcast. Finally, the District Court found the local affiliates had a three hour hiatus in which to access the segment for content, and the contractual right to censor the segment. Nevertheless, the Court stated:

> With the possible exception of re-run movies, the content of which is already widely known and/or catalogued, plaintiffs' construction would force the creation of full time editorial boards at local stations throughout the country which possess sufficient knowledge, legal acumen and access to experts to continually monitor incoming transmissions and exercise on-the-spot discretionary calls or face $75 million dollar lawsuits at every turn. That is not realistic.

800 F.Supp. at 931. The District Court went on to state the threshold inquiry in such cases is "whether a local broadcaster who serves as a mere conduit 'republishes' by relaying an unedited feed." *id.*, and held the three local affiliates did not have knowledge sufficient enough for liability. In concluding its analysis, the District Court stated:

> More than merely unrealistic in economic terms, it is difficult to imagine a scenario more chilling on the media's right of expression and the public's right to know.... Persons injured by defamatory material are not impaired by limiting conduit liability to those situations where culpability is established. The generating source, which in a national broadcast will

generally be the deepest of pockets, may still be called upon to defend.

*Id.* at 932. And so it is with the case at bar, the economic feasibility for a local TV station to monitor an unedited feed from a network source that has already been reviewed for content by the network's in-house legal department is impractical. Furthermore, to attribute responsibility "down the line" to a local TV station when the issue is better left to those responsible for the segment's actual content is overreaching in this Court's opinion. This Court must come to the conclusion that the evidence put forth by Merco is insufficient to overcome the standard of a clear and convincing demonstration of actual malice by Tri–State. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) ("When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times*. For example, there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational trier of fact to find actual malice by clear and convincing evidence."). Therefore, the evidence rebutting Tri–State's motion for summary judgment does not convince this Court by clear and convincing evidence that the actions or non-actions of KTSM in the time leading up to and including the republication of the TV Nation "feed" contained actual malice such that a jury would return a verdict for Merco. *Id.* at 249, 106 S.Ct. at 2511.

As mentioned in Part I above, section 73.004 requires that there be a finding of defamation before the defense of ordinary care afforded by section 73.004 can be used. Because this Court has found no showing of defamation according to the New York Times Rule, there is no need to address the defense of ordinary care within the Liability of Broadcaster statute.[3] Therefore, Tri–State, although precluded from applying section 73.004 successfully in its first motion for

---

**3.** Which, incidentally, is a question for the trier of fact. *Evans v. City of Marlin, Texas*, 986 F.2d 104, 109 (5th Cir.1993).

summary judgment, is nevertheless granted summary judgment based on its second motion for summary judgment addressing actual malice.[4]

## II. ACTUAL MALICE OF REMAINING DEFENDANTS

The next determination for this Court is whether the remaining Defendants which also filed the second motion for summary judgment warrant dismissal pursuant to Rule 56 as well. Since this Court has already established in part I(a) and (b) above that Merco is a limited purpose public figure and that the New York Times Rule applies for purposes of the burden of proof standard, the only inquiry left is whether TriStar and/or Roy Sekoff acted with actual malice.

### a. Roy Sekoff

■ Merco argues that Roy Sekoff and TriStar knew from the outset that the broadcast segment would be a "hatchet job." Merco offers an internal memorandum from Randy Cohen, a writer and executive producer of TV Nation, outlining the characteristics the Sludge Train segment should take on. In the internal memorandum are various derogatory references to Merco's application of New York sludge to "the Texas prairie or plains of [sic] buttes or mesas or what ever [sic] perverse geologic features they have out there." *Memorandum of Randy Cohen,* at 1 (April 1, 1994). Sekoff followed these instructions almost verbatim during his report.

Furthermore, during an interview with one of Merco's employees, Julie Porter, TriStar and/or Sekoff seem to have augmented a statement she made on camera describing a reference to her husband's business as a statement about the Merco Project:

Q. Now, you were saying—we were just finishing up. I was asking you what fragrance you wore.

A. I don't. I'm—I'm allergic to—colognes and perfumes.

Q. But the residue from the biosolids don't—doesn't bother you?

A. No. I—in fact, we—don't catch smell from it. As long as it dries out, there is—no odor to it. If—if it does happen to get wet, there may be a—a smell to it.

Q. So it would be "Chanel No Way Sludge 5?"

A. Well, like my husband says, he—he is into the cattle [business], and whatever you get around a feed yard or—or something and you say, oh, it smells. He says, ah, that's the smell of money. It's okay.

Q. So are we catching a little bit of the "ode to money" here now? Let me see.

A. No, there's no odor.

Q. No odor.

A. No.

Q. No smell of money?

A. There's—there's very seldom an odor.

Q. But money?

A. No, no smell of money either, really.

*Video Outtake,* "TV Nation/Sludge Train" (June 1994). The only portion of the interview of Porter was the quote "that's the smell of money. It's okay," indicating that Porter was speaking of the Merco Project.

Finally, Sekoff's statement that the New York sludge contained "high levels" of lead, mercury and PCBs seems to be contradicted by the evidence offered in letter by the EPA to Merco, which stated that the sludge is tested at the generating treatment plant, again before it is loaded on to railcars destined for Texas, and again upon arrival in Texas. If at any point the sludge tests for high levels of pollutants, it is designated for land fill and not for surface application. *Letter from Buck Wayne, Regional Administrator, EPA,* at 2 (Oct. 2, 1992). Sekoff responds that he was basing the statement on Hugh Kaufman's actual knowledge and investigation, yet he was told by a Merco employee, on camera, that the levels of heavy metals were low enough to be considered safe as trace minerals for plants for up to 39 years according to the EPA. *Video Outtake,* "TV Nation/Sludge Train" (June 1994).

Whether Sekoff's actions and statements prove that he knew they were based on false

---

**4.** *See infra,* Part III entitled "Post–Mortem."

information, or whether he recklessly disregarded such, is a genuine issue of material fact for the jury. This Court is of the opinion, based on clear and convincing evidence, that Sekoff may have actually had malicious intent in shooting the footage, augmenting the statements of Porter, and stating that there were high levels of pollutants in the sludge, such that a jury could return a verdict for Merco. The motion for summary judgment pursuant to Rule 56 is therefore denied as to Sekoff.

### b. TriStar Television

■ The potential liability of TriStar is demonstrated through the actions of Frances Alswang, producer of the Sludge Train segment. Alswang admitted that she had done substantial investigation of the Merco Project and Sludge application projects throughout the nation. For example, Alswang telephoned farmers in other states who had successfully applied sludge on their own properties and asked them questions regarding the sludge. In every case, the farmers whom she contacted in Colorado and Arizona were positive about the surface application of sludge. Additionally, Alswang admitted to reading this Court's opinion in *State v. Furgeson*, reports, and articles on the beneficial and legal application of sludge.

Alswang also held herself out to Merco as being affiliated with NBC News, a statement strongly denied by the Law Department for NBC. In a letter sent by a Senior General Attorney for NBC in May of 1994 to Sandra Stern, Executive Vice President of Business Affairs for TriStar, NBC stated:

> Please confirm immediately that you [TriStar], Remote Broadcasting Co. and Michael Moore will cease and desist from holding yourselves out as employees or agents of NBC or NBC News, directly or indirectly. You may not use NBC, the NBC peacock or other insignia to suggest that you are representing NBC or NBC News. NBC will, of course, look to you for complete indemnification for any damages which might arise as a result of any such conduct.

*Letter from Roberta Brackman,* at 2 (May 4, 1994). This Court is of the opinion, based on clear and convincing evidence, that Alswang conducted substantial research on the Merco Project and on the application of sludge, and that she may have actually had malicious intent while investigating and producing the footage for the Sludge Train segment such that a jury could return a verdict for Merco. The motion for summary judgment is therefore denied as to TriStar.

### III. POST–MORTEM

After the writing of this Order but before the actual filing, Plaintiff timely filed a motion for voluntary dismissal of Defendant Tri–State. The analysis set out above regarding TEX.CIV.PRAC.REM.CODE ANN. § 73.004 remains nevertheless valid, although the Court's conclusion with regard to Tri–State is no longer viable. Accordingly,

**IT IS ORDERED** Defendant Tri–State's motion for summary judgment pursuant to FED.R.CIV.P. 56 is hereby denied as **MOOT** in light of Plaintiff's voluntary dismissal of its claim against Tri–State.

**IT IS FURTHER ORDERED** Defendants Roy Sekoff's and TriStar's motions for summary judgment pursuant to FED.R.CIV.P. 56 is hereby **DENIED.**

**SIGNED and FILED.**