UNITED AIRCRAFT CORPORATION, Plaintiff, v. PAUL HARDEMAN, INC., Defendant.

(*October* 22, 1964)

DUFFY, P. J., sitting.

*Edmund N. Carpenter, II,* and *William T. Quillen,* of Richards, Layton & Finger, for plaintiff.

*James L. Latchum,* of Berl, Potter & Anderson, and *Arnold M. Schwartz,* of Schwartz & Sandler, for defendant.

Superior Court of Delaware, New Castle County, No. 199 Civil Action 1962.

DUFFY, President Judge.

This is an action by United Aircraft Corporation ("United Aircraft") against Paul Hardeman, Inc. ("Hardeman") for moneys owed as a result of work performed by the Hamilton Standard Division of United Aircraft ("Hamilton Standard") for Hardeman. Hardeman counterclaimed for losses caused by Hamilton Standard.

Hamilton Standard, an operating division of United Aircraft, has long been active in the aircraft industry and, in recent years, has directed resources toward meeting the United States Government's requirements in the missile programs. Hardeman is a large engineering and construction company engaged in various projects around the world.

In the spring of 1961, Hamilton Standard's personnel, including those servicing the aircraft industry in southern California, were aware that the Air Force planned to construct silos for the emplacement of

operational Titan II missiles. The Titan II is an intercontinental ballistic missile employed in the national defense of the United States.

The Titan II program included a single prime contract for manufacturing, delivering, installing and validating 57 fixed Propellant Transfer Systems ("PTS") and 9 (later increased to 10) units of mobile propellant transfer equipment at 4 general sites in California, Arizona, Kansas and Arkansas. That contract included 9 (also increased to 10) waste propellant disposal trailers for use with the fixed and mobile PTS facilities.

A Propellant Transfer System is the device or means for handling, loading and unloading the propellant used in the Titan II. The propellant consists of fuel and an oxidizer.[1] At the 57 launch facilities, the Propellant Transfer Systems were to be installed in silos, which are large reinforced concrete underground chambers. These were to be constructed under the terms of contracts other than the contract for the Propellant Transfer Systems. The mobile PTS units, including the waste propellant disposal equipment, were to be mounted on trailers and used in conjunction with the fixed propellant transfer facilities for transferring propellant to and from the missile propellant tanks and for disposing of waste propellant.

If a missile were drained without firing (and it was expected that this would be done with some regularity), then the propellant would have to be burned. The waste propellant disposal trailers called for under the PTS prime contract were mobile pieces of equipment designed to burn waste propellant. That propellant consists of the fuel and oxidizer vapors. Burning is necessary so that the highly toxic liquid waste and fumes are reduced to a condition not injurious to human life.

The subcontract to manufacture the waste propellant disposal trailers is the matter involved in this action.

-----

[1]The fuel is an equal mixture by weight of hydrazine and unsymmetrical dimenthyl hydrazine (commonly referred to as UDMH). The oxidizer is liquid nitrogen tetroxide. Both fuel and oxidizer are highly toxic.

Hamilton Standard had had prior experience with the disposal of waste gasses in the research place of the Titan II program. Specifically, it had completed a test program for the Martin Company to determine the feasibility of destroying aerozine and nitrogen tetroxide vapors by burning.

Following a practice common in the aerospace industry, Hamilton Standard set about informing the potential prime contractors of its capabilities. One of these was Hardeman, which had been involved in various phases of missile base construction projects. The Air Force had invited Hardeman and seven others to submit project proposals for the prime contract. Following up its various prior sales efforts, Hamilton Standard submitted to Hardeman on May 23, 1961 a management proposal in which its prior experience and know-how were emphasized. This proposal was essentially a sales promotion piece designed to secure a contract for all mobile equipment called for by the prime contract. Similar proposals were sent by Hamilton Standard to the other potential prime contractors, and all were followed up by its sales and technical personnel.

On July 1, 1961 the Air Force announced that it had awarded the Titan II prime contract for the propellant transfer systems to Hardeman. Thereafter Hardeman intensified its negotiations with various potential subcontractors, including Hamilton Standard. These culminated in a three-day meeting with Hamilton Standard at Hardeman's offices in California attended by technical and management people from both sides. Near the end of the meeting, on August 17, Hamilton Standard hand-delivered a letter to Hardeman reading as follows:

"Submitted herewith is our revised quotation for the subject equipment to include the additional requirements as discussed in our meeting of August 16 and those as set forth in your letter dated July 31, 1961.

"For clarification, we wish to restate that the equipment being offered herewith is in conformance with un-numbered and un-dated

specification entitled 'Waste Propellant Disposal Trailer' identified as Section 9 as amended by attachment A. It should be noted that the proposed hardware completely meets the specified performance but deviates from some of the detailed requirements of the aforementioned unnumbered specification. We are prepared to review attachment A with your people at your earliest convenience in order to resolve any questions you may have.

"Regarding the requirements of your July 31 letter, attachment B summarizes our comments to the 'Special Requirements' section contained therein. These requirements are acceptable with the exceptions as noted in attachment B. The requirements of your July 31 letter dealing with drawings per MIL–D–70327 are acceptable but acceptance of AFBM Exhibit 60–3A and WDT Exhibits 57–17 must remain open until such time these documents are available for our review.

"Delivery of ten each of the subject units is noted as follows based on an August 18, 1961 contract go ahead:

1 unit by December 31, 1961
1 unit by January 28, 1962
1 unit by February 25, 1962
1 unit by March 25, 1962
1 unit per month thereafter to completion.

"The above schedule reflects on dock dates at the Hamilton Standard plant, Windsor Locks, Connecticut.

"Our cost quotation for the design, fabrication, testing and delivery of ten each of the subject units to the above schedule is $385,250. This quotation includes a one percent (1%) rental factor for Government-Owned Facilities under Navy Facilities Contract No. A-5929. Rent free use statement in any resulting contract will decrease the contract price by one percent (1%).

"Our cost quotation for the MIL–D–70327 drawing

requirement of your July 31 letter is $18,000 while the cost of the operation and maintenance data per Paragraph 5 of the Special Requirements attachment of your July 31 letter is $6,500.

"Hamilton Standard will per Section 7 of Special Requirements furnish representatives at sites or where ever needed to supervise and train personnel in the proper operation and maintenance during the field checkout and testing of the propellant waste disposal units and the completed propellant transfer system. However, this service is not considered part of our present offering. These services will be on the basis of $72 per man day plus travel and living expenses for the number of days they may be needed.

"This quotation is offered f. o. b. Windsor Locks, Connecticut, and is firm for a period of 30 days and is based upon receipt of a fixed price contract and subject to terms and conditions as noted on the reverse of this letter with the exception of the warrantee statement. The warrantee statement is to be changed to read as follows: 'The propellant disposal trailer shall be guaranteed for a period of one year from the date of acceptance thereof, either for beneficial use or final acceptance, whichever is earlier, against defective materials, design, and workmanship. Upon receipt of notice from the Buyer or the Government of the failure of any part of the guaranteed equipment during the guarantee period, the effected part or parts shall be replaced promptly with new parts at the expense of Hamilton Standard Division of United Aircraft Corporation, Windsor Locks, Connecticut.' * * *."[2]

Attachments A and B to this letter were technical specification amendments which, among other things, summarized the differences between the equipment proposed by Hamilton Standard and the specifications prepared for the Government by its consultant, The Ralph M. Parsons Company ("Parsons").

-----

[2]The total price under this quotation, $409,750, was reduced next day by Hamilton Standard to $399,750 after further review of its costs.

At the end of the August meeting, Raymond H. Lull, Hardeman Vice-President and its manager for the entire project, orally told Hamilton Standard that it "had the contract." When Hamilton Standard asked for written confirmation, Hardeman gave a letter reading as follows:

"Confirming verbal assignment of Paul Hardeman Inc., purchase order ST—16574 for furnishing ten (10) Waste Propellant Disposal Trailers complete in accordance with the above referenced project specifications and drawings.

"Total contract price is THREE HUNDRED NINETY NINE THOUSAND, FIVE HUNDRED DOLLARS ($399,500.00), F.O.B., Windsor Locks, Connecticut.

"The purchase order will be subject in all respects to the approval of the Contracting Officer, U.S. Air Force."

Thereafter, Hamilton Standard promptly began work. A project team was organized under the nominal leadership of John H. Vanderbilt, and various technical personnel were assigned to it. In anticipation of a share of the project—indeed, to improve its selling position—Hamilton Standard had, on June 12, 1961, ordered a prototype burner from Fabricating Engineering Co:, Inc. Mr. Vanderbilt promptly checked the status of this order and found that the burner was about half completed. He also set about consolidating various technical documents, which were unnumbered and undated, into a single specification. This was completed and sent to Hardeman about August 25, and shortly thereafter Hamilton Standard issued a purchase order to Aerotest Lab. Inc. for the testing program.

On September 6 Hamilton Standard sent a wire to Hardeman asking for "suitable coverage" to proceed with the work in advance of a negotiated contract. This was followed by a conference at Hardeman's office in California attended by administrative and technical personnel from both of the corporations. At the end of the conference, on September 13, 1961, Hardeman sent Hamilton Standard a telegram

reading as follows:

"REFERENCE PHI PURCHASE ORDER NO. ST–16574 THIS IS YOUR FORMAL AUTHORITY TO PROCEED WITH THE DESIGN, MANUFACTURE AND ASSEMBLY OF 10-WASTE PROPELLANT DISPOSAL TRAILERS PER GOVERNMENT SPECIFICATION SECTIONS 9 AND 5 WS 107 A–2 DATED JUNE 6, 1961, PREVIOUSLY FURNISHED FOR YOUR PORTION OF THE PROGRAM. THE ACCEPTANCE DATE OF THIS PURCHASE ORDER SHALL BE 8/18/61, AND MONIES EXPENDED FROM THAT DATE SHALL BE ALLOWABLE TOWARD THE TOTAL ESTIMATED COST OF THIS PROGRAM–AS QUOTED IN YOUR PROPOSAL 8/17/61.

"PAUL HARDEMAN, INC., IS PRESENTLY WORKING ON A LETTER OF INTENT FROM THE AIR FORCE, AND PENDING A DEFINITIVE CONTRACT THE FUNDS ALLOTTED TO ABOVE PURCHASE ORDER SHALL BE AUTHORIZED.

"THIS IS YOUR AUTHORITY TO EXPEND $100,000.00 AGAINST PAUL HARDEMAN, INC., PURCHASE ORDER NO. ST–16574. YOUR COST PROPOSAL IN THE AMOUNT OF $399,500.00 TO PERFORM ON THIS PURCHASE ORDER DATED 8/17/61 IS ACCEPTED.

"THE FUNDS AUTHORIZED UNDER THIS WIRE AUTHORIZATION IS FOR THE PERIOD 8/18/61 THROUGH AND INCLUDING 9/30/61. PHI WILL NOTIFY YOU OF ANY EXTENSION OF FUNDS THEREAFTER. YOU ARE NOT OBLIGATED TO INCUR ANY COST IN EXCESS OF THE AUTHORIZED AMOUNT CONTAINED IN THIS NIGHT LETTER. ANY EXPENDITURE IN EXCESS OF THE AUTHORIZED AMOUNT SHALL NOT BE ALLOWABLE AS A COST UNDER THIS NIGHT LETTER UNLESS RATIFIED BY PHI. TERMS AND CONDITIONS AND THE FINAL SPECIFICATION SHALL BE NEGOTIATED SUBJECT TO MUTUAL AGREEMENT. IT IS THE PARTIES' INTENT THAT SUCH PROVISIONS NOT BE INCONSISTENT WITH

THE PROVISIONS OF THE RESULTING PRIME CONTRACT. THE CLAUSE FOUND IN ASPR 8–706 'TERMINATIONS' AS IN EFFECT ON THE DATE OF THE WIRE AUTHORIZATION IS HEREBY INCORPORATED AND MADE A PART OF THIS WIRE AUTHORIZATION TO PROCEED EXCEPT THAT THE WORDS 'THE BUYER AND' APPEARING IN THE LAST SENTENCE OF PARAGRAPH (i) OF ASPR 8–706 ARE DELETED. THE FOLLOWING CLAUSES FOUND IN ASPR ARE INCORPORATED IN THIS WIRE AUTHORIZATION:

"1. ASPR 7–104.4 NOTICE OF THE GOVERNMENT OF LABOR DISPUTES.

"2. NONDISCRIMINATION CLAUSE OF ASPR DATED (MARCH, '61)

"3. ASPR 7–203.7 (b) RECORDS."

On September 18 Hamilton Standard sent Hardeman a telegram reading as follows:

"WE THANK YOU FOR YOUR WIRE OF SEPT. FOURTEENTH AUTHORIZING US TO PROCEED AGAINST YOUR PO ST–16574. WE ACCEPT THIS WIRE AND ARE PROCEEDING IN ACCORDANCE WITH THE TERMS AND CONDITIONS CONTAINED THEREIN."

During the September conference it became apparent that there were two significant technical problems. The first related to the availability of water at the sites for cooling purposes, and the second, to the type of front wheels to be used on the trailers.

The burner was required to be capable of maintaining a combustion temperature between 2000 and 2500 degrees Fahrenheit, and continuous operation in this range presented cooling questions. In the testing Hamilton Standard had performed for the Martin Company

water had been used to cool the burner.

None of the specifications available prior to August 17 prescribed the technique by which cooling was to be accomplished. On that date Hamilton Standard did not know how it would cool the burner. Because of the uncertainty, David W. Cogswell, Hamilton Standard's engineer who prepared Attachment A to the August 17 proposal, deliberately left out the procedure for cooling; he intended to leave this open for later decision by Hamilton Standard. But he knew that Hamilton Standard's testing for Martin had utilized water. And he assumed that water was available at the sites because the drawings provided by Hardeman showed that water was to be used for flushing the propellant storage tanks, for cooling in the air compressor and for other purposes.

By the time of the September conference, Hamilton Standard had concluded that the burning mixture had to be cooled by the injection of water. At this time the conclusion was based principally upon theoretical calculations, most of which were derived from computer outputs (IBM runs) made by Dr. John D. Rockenfeller, Hamilton Standard's combustion expert. And at the conference Hamilton Standard learned for the first time that water was not available to it for cooling purposes. Hardeman took the position that it would request the Air Force to make water available if Hamilton Standard would demonstrate the need for it by tests or by theoretical calculations.

The second significant issue related to the type of front wheels and steering mechanism for the trailers. Hamilton Standard's position was that it was not obligated to supply dual front wheels (that is, two wheels on the same axle on each side) controlled by automotive-type steering, that it had been told at the August conference that a Fruehauf trailer was to be used, and that trailer had single wheels. In addition, it argued that such an arrangement was neither feasible nor practical. Hardeman's response was that the specifications called for dual front wheels and automotive steering and any deviation from the specifications required Air Force approval. Eventually (on October 26)

Hardeman formally requested the Air Force for a change from dual to single front wheels. But the whole subject remained one of friction between the parties as to what the specifications called for, what Hamilton Standard was originally obligated to provide, what credit should be allowed for the change, and what additional costs should be allowed.

On September 26 Hardeman, at Hamilton Standard's request, increased the authorized expenditure to $175,000 and extended the period covered by the September 6 wire from the end of that month to October 31, 1961.

After extensive preparations, testing began at Aerotest on October 4 and continued for about ten days. On October 14 Paul J.Schroeder, Hardeman's chief engineer who was in charge of all technical parts of the program, visited the test site on Long Island. At this time the necessity for water for cooling in the burner remained an important and unresolved issue between the parties. Mr. Schroeder suggested that a specific test be run: after getting the burner in satisfactory operation, gradually reduce primary fuel and air with the objective of lowering heat input and gradually reduce the injection of water in the hope of being able to eliminate it entirely. Mr. Vanderbilt first agreed to performing this test but later changed his mind because test costs were already substantial and Hamilton Standard was satisfied from the tests which had been run and from Dr. Rockenfeller's calculations that water was essential.

While water and wheels were the main issues, other differences contributed to the deterioration of relations between the parties. Among other things, these were the hose and valve requirements, the type and source of paint to be used, the delivery schedule, the size of fuel storage tanks, and the requirements for validation testing.

These and other matters were the subject of an intensive, persistent and futile exchange of communications between the parties. They continued to quarrel about specifications, tests, costs and lesser matters.

By October 19 both parties were disturbed at the lack of mutual understanding, and both suggested a conference. This was held at the Hardeman offices in California from October 25 to October 27. Key personnel from both sides attended. They reviewed a long list of technical matters with a view toward agreeing upon an interpretation of the specifications and their respective obligations. Many of the specification issues were resolved, but water and wheels remained uncertainties. As to the former, Hardeman agreed to ask the Air Force to provide water for burner cooling, but as to the trailer, Hamilton Standard agreed to provide only what Fruehauf would supply, and this without warranty and with a price increase. Hamilton Standard claimed extra costs totaling about $114,000. This included such items as costs incurred in proving the need for water, changes in the system for maintaining flow pressure in the units, and the cost of providing the dual front wheels with automotive steering on the trailers. In addition, certain "standard" contract clauses ("time of the essence," for example) and delivery dates were not settled.

During or at the end of the October conference, Hardeman received from the Air Force an approved Purchase Order for award of the contract to Hamilton Standard at $399,750; this had been submitted for Air Force approval on September 1. On October 28 Hardeman sent the Purchase Order to Hamilton Standard for signature and two days later told Hamilton Standard that it "supercedes and voids all previous letter contracts, or wire authorizations."

Hamilton Standard declined to accept the Purchase Order as written because "it does not reflect mutually agreeable specs and terms and conditions."

Further discussions were held, but to no avail. Hardeman wanted Hamilton Standard to sign the Purchase Order upon the understanding that Hardeman would seek Air Force approval for the specification "changes" and extra costs which Hamilton Standard wanted. Hamilton Standard refused to accept the risks involved in this suggestion and stopped all work. Eventually Hardeman went to another supplier for the burners and itself assembled the trailer units.

The trial was long, the record is voluminous. Jointly and severally the parties put in some 250 exhibits covering about 3,000 pages of letters, telegrams, charts, diagrams, specifications, and memoranda. This quantity alone points up the complex nature of the technical undertaking in which the parties were engaged and the exhaustive exchange of paper which took place.

In its narrowest context Hamilton Standard argues that its acceptance of Hardeman's telegram of September 13 resulted in a contract and under that contract it is entitled to $175,000. Hamilton Standard contends that it was operating under broad and indefinite specifications which gave rise to reasonable and urgent questions which Hardeman refused to answer, for the most part, and when answer was given, it was "subject to Air Force approval." So, says Hamilton Standard, it was put to the risk of guessing correctly as to what was wanted, and this it declined to do.

On the other hand, Hardeman says that it accepted Hamilton Standard's offer of August 17 and that under the resulting contract Hamilton Standard was obliged to produce the ten trailers for $399,750 on the dates stated. Since it did not do so, argues Hardeman, Hamilton Standard is liable for Hardeman's consequent losses. As to the specifications, Hardeman contends that Hamilton Standard raised a continuous and unending series of detailed questions designed to free itself of all responsibility while, at the same time, laying a foundation for requesting more money. Eventually, continues Hardeman, Hamilton Standard stopped work and did demand more money.

At this point it is appropriate to note several significant factors about the parties and what they were trying to do. First, both were old-hands at Government work and contracts. Both knew, for example, what "subject to Air Force approval" meant in principle and practice. Second, it was quite evident that there was an air of urgency about the entire project. Third, and perhaps most important, the equipment and the units involved had never been built before by anyone. The pertinent specifications were performance specifications and, understandably,

broad in character and lacking that specificity which maximizes understandings and minimizes lawsuits. But detailed specifications had to await the "as-built" stage and these parties were, in reality, only at the development point.

 The first offer by either party was the Hamilton Standard letter of August 17. To this there was admittedly no written acceptance by Hardeman. It contends, however, that Mr. Lull made a verbal acceptance. Since both of the parties were then in California, the law of that State governs in determining whether or not a contract resulted from the exchange. *Wilmington Trust Company v. Pennsylvania Company, Del.,* 172 A.2d 63 (1961); *Harris v. New York Life Insurance Co.,* 27 Del. Ch. 170, 33 A.2d 154 (1943); Goodrich, Conflict of Laws, Sec. 104; Restatement, Conflict of Laws, Sec. 311. And under that law an acceptance must be absolute and unqualified. California Civil Code, Sec. 1585. Under general law an acceptance must be unqualified and unequivocal. 1 Corbin on Contracts, Sec. 82; 1 Williston on Contracts, Sec. 72.

Measured by this standard, I am satisfied that Mr. Lull's comments to Hamilton Standard were not an acceptance of the offer which, as the context shows, was long and detailed. Mr. Lull's language just did not amount to his agreement to those terms. In addition, the surrounding circumstances strongly suggest that Mr. Lull did not orally accept the Hamilton Standard proposal. He knew, for example, that all purchase orders in excess of $10,000 required Air Force approval. And the record does not show that at that time the Air Force had approved an award of the contract to Hamilton Standard. Indeed, the letter which was given next day quite clearly implies that approval had not been given because assignment of the purchase order was "subject in all respects to the approval of the Contracting Officer, U. S. Air Force." In contrast, Hardeman had Air Force approval when it sent the September 13 wire to Hamilton Standard.[3]

---

[3]On September 13 Mr. Lull wired the Air Force Contracting Officer as follows: "This will confirm our telecon of 9/13 in which you agreed that you would confirm in writing that Hamilton Standard Division of United Aircraft Corporation is the approved source for furnishing the waste disposal trailers under PHI Purchase Order No. ST–16574 to that vendor. On the basis of this telecon we have funded Hamilton Standard in the amount of $100,000.00 to continue work to 30 September 61. Your acknowledgment of this wire is requested."

Hardeman's letter of August 18, given at Hamilton Standard's request, confirming "verbal assignment of Paul Hardeman, Inc., purchase order" was certainly not an acceptance if only because by its specific terms it was "subject in all respects to the approval of the Contracting Officer, U. S. Air Force." *Humes v. Walker,* 116 Cal. App. 599, 3 P.2d 33 (1931). And even if it were considered a counter offer, it would have no significance because Hamilton Standard never assented to its terms. Its telegram of September 6 shows this and it is against the grain of the evidence to conclude that Hamilton Standard would "assent" to such a "thin" agreement—and put itself at the mercy of Air Force approval of even that—immediately after it had concluded several days of intense negotiations by submitting the long and detailed proposal of August 17.

The Hamilton Standard wire of September 6 to Hardeman quite acurately pointed up the absence of clear instructions and agreement responsibilities at that time. It said that the August 18 "letter does not provide clear instructions and does not reflect major considerations in this type of letter of intent to enable work to proceed in advance of negotiated contract." Hardeman agreed with this because it undertook discussions with Hamilton Standard and, as a result, sent the wire of September 13 which said, "This is your formal authority to proceed * * * per Government specifications * * *." Next day Hamilton Standard responded by saying, "We accept this wire and are proceeding in accordance with the terms and conditions contained therein." It seems quite plain that this acceptance was unqualified and unequivocal and a contract therefore resulted. California Civil Code. Sec. 1585; *Leigh v. Smith,* 138 Conn. 494, 86 A.2d 567 (1952); *L. & E. Wertheimer, Inc. v. Wehle-Hartford Co.,* 126 Conn. 30, 9 A.2d 279, 125 A.L.R. 985 (1939); 1 Corbin on Contracts, Sec. 81, 82; 1 Williston on Contracts, Sec. 72, 73.

In my opinion these documents, as amended by the telegram subsequently increasing the funds to $175,000 and extending the time to October 31, establish the basic rights and duties of the parties.

Under this agreement Hamilton Standard was to proceed with

the "design manufacture and assembly of 10-waste propellant disposal trailers per government specification Sections 9 and 5 WS107—A2 dated June 6, 1961 previously furnished for" its portion of the program.

The specifications referred to were the parts specifications. Section 5 related to the trailers for the mobile equipment, and Section 9 to the equipment for the trailers. As already indicated, these were essentially performance specifications. And, unquestionably, Hamilton Standard engaged in the design and manufacture of the units. Technical personnel were working on the project, rewrites of various technical documents were undertaken, testing was planned and programmed. In short, Hamilton Standard promptly performed what was called for on its part. In that performance technical uncertainties arose. And this was to be expected in light of the performance nature of the specifications and the developmental nature of what was being done. This had also been expected and anticipated by Hardeman because its telegram of September 13 stated, "Terms and conditions and the final specifications shall be negotiated subject to mutual agreement." But were the questions which Hamilton Standard raised reasonable under the circumstances?

First, as to water. This is the kind of basic essential one might reasonably expect to be provided even at the desert sites here involved. And the documents furnished to Hamilton Standard certainly showed that water was to be used at the sites—for flushing the propellant tanks and for cooling the air compressor, among other things. In addition, the water required for flushing purposes was in a quantity comparable to that which would normally be required for burning. It therefore appears to me that under all of the circumstances Mr. Cogswell's assumption that water would be available was, at least, not unreasonable.

And as to the necessity for water, the testimony established that it was essential in the cooling process for the Hamilton Standard burner.[4]

---

[4]Water was also used to cool the burners which Hardeman purchased from Coen Company and installed on the trailers.

The water requirement led to additional testing by Hamilton Standard. Certainly some of this, at least, was done to satisfy Hardeman. Although Mr. Schroeder was informed about the IBM runs, he never saw these and, in any event, did not know how to interpret them. And while Hamilton Standard might have been more cooperative in giving Hardeman the calculations for which it asked and in running the tests which Mr. Schroeder suggested, in retrospect I cannot say that Hamilton Standard's position was legally unreasonable. The matter really came to a head in mid-October, after Hamilton Standard had been deeply involved in testing and when its financial expenditure was already substantial and it was operating under authority to spend money only until October 31.

Second, as to wheels. Any investigation of the differences of the parties as to these points up conflicts in the various specifications and drawings. A detailed scheduling of these will serve no purpose. I need only say that some of the documents called for dual front wheels on the trailers, others called for single front wheels on the very same vehicles. What was Hamilton Standard's obligation?

Under the contract, Hamilton Standard was obliged to produce "trailers per government specification Sections * * * 5 WS107—A2 dated June 6, 1961 previously furnished * * *." There are two sets of such specifications in evidence and they differ in various ways. It is not necessary to attempt to reconstruct how the specifications were handed about and by whom, and precisely which set Hardeman had in mind when it sent the September 13 telegram and which set Hamilton Standard had in mind when it accepted that offer. I find it not necessary to reach that point because the two sets of specifications are substantially the same on the key question.

Section 5—03(b) in *both* sets of specifications states that the contract drawings are covered in Section 1—04. And *both* of those sections state that the contract drawing list is in the Construction Contract. And the Construction Contract (between the Air Force and Hardeman) includes Drawings S—PM—M1: Dimensional Outline of

Mobile Units. That was the official drawing, prepared by Parsons in June 1961. It was given by Mr. Lull to James Needham, a Hamilton Standard representative, on July 20, 1961. And it shows single wheels.

I also note that a proposal made directly by Fruehauf Trailer Company to Hardeman on July 28, 1961 does not provide for dual front wheels. And the information as to Fruehauf's trailer was communicated to Hamilton Standard by Hardeman at the August meeting. As a result of this, Attachment A to Hamilton Standard's August 17 offer stated, "It is planned to utilize a Fruehauf trailer."

I therefore conclude that Hamilton Standard was not obligated to supply a dual-wheel trailer with automotive steering and that its position as to this was not unreasonable.

As I have already indicated, there were various other differences between the parties, but it is not necessary to examine these in view of my other conclusions.

The contract between the parties was limited in both time and money and it, in so many words, contemplated further agreement: "Terms and conditions and the final specification shall be negotiated subject to mutual agreement." Hamilton Standard did what it was obligated to do under the agreement which was made: it proceeded with the design, manufacture and assembly of the disposal trailers. For this it is entitled to be paid its costs. Thus the decision can rest upon this finding. But I also find that Hamilton Standard's position as to the key matters in dispute was not unreasonable. Hence it did not frustrate the additional "mutual agreement" to which the parties looked nor did it fail to discharge its obligations under the agreement actually made.

As to damages, I am satisfied that Hamilton Standard proved direct costs of $128,689.27 to which a general overhead of $26,342.69 (20.47%) should be added for a total of $155,031.96. And since the "estimated cost" of the program included a profit figure, this will be allowed at the 10% rate to which Hamilton Standard's evidence was

directed. Thus $15,503.20 will be added for a total of $170,535.16. But Hamilton Standard did not prove its right to "anticipatory profit" which it claimed, and this will therefore be denied. And I am not satisfied that this is an allowable item of "cost" under the terms of the agreement which I have found to be binding upon the parties. In addition, Hamilton Standard's allowable damages must be reduced by $2,975 which represents $2,250 applicable to the Fabricating Engineering Co. burner purchase for expenditures prior to August 18, 1961 and profit and overhead on that sum. Thus the total judgment to be entered in favor of Hamilton Standard against Hardeman is $167,560.16.

As to Hardeman's counterclaim, this is founded upon a contract resulting from its acceptance of Hamilton Standard's offer of August 17 or upon a claim that Hamilton Standard did not have the right to stop work as it did. Since I have found against Hardeman on both of these matters, it follows that the counterclaim must be denied.