Grady AUVIL et ux; et al., Plaintiffs,

v.

CBS "60 MINUTES"; et al., Defendants.

No. CS–90–553–RJM.

United States District Court,
E.D. Washington.

June 18, 1992.

---

David H. Putney, J. Jarrette Sandlin, Sandlin Law Firm, Yakima, Wash., Scott A. Jonsson, Schwabe Williamson and Wyatt, Portland, Or., for plaintiffs.

Bruce E.H. Johnson, P. Cameron De-Vore, Janet McDonald, Davis Wright Tremaine, Seattle, Wash., Douglas P. Jacobs,

Susanna M. Lowy, Anthony Bongiorno, CBS Inc., New York City, Ted Roy, Roy & Pell, Yakima, Wash., Peter D. Byrnes, Byrnes & Keller, Seattle, Wash., Fred H. Altshuler, Stephen P. Berzon, Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, Cal., Eugene I. Annis, Lukins & Annis, Spokane, Wash., George A. Lehner, Kim Heebner Price, Pepper, Hamilton & Scheetz, Washington, D.C., for defendants.

## ORDER

WM. FREMMING NIELSEN, District Judge.

All motions then pending were resolved by Order entered June 5, 1992 save for the motion to dismiss or in the alternative for summary judgment brought by the Natural Resources Defense Council [NRDC] and Fenton Communications. In the interest of economy, that Order is incorporated by reference. Suffice it to say that on February 26, 1989 CBS "60 Minutes" aired a televised report on Alar, a growth regulator used most commonly on apples and suspected of being a potent carcinogen. That incident provoked what has come to be known as the "Alar Scare." Apples had not received such bad press since Genesis. The shock value of learning that a product universally considered so wholesome and all-American as apples could give children cancer galvanized parents nationwide into a boycott which had an immediate financial impact on Washington growers.

The segment was based in part on a study performed by NRDC. *Intolerable Risk: Pesticides in our Children's Food* [*"Risk"*]. This suit followed which alleges, *inter alia*, product disparagement. During the summary judgment hearing, the Court promised counsel a speedy disposition, and rather than delay ruling on the core issues vis a vis "60 Minutes" while the NRDC report was digested, that matter was reserved.

With substantial assistance from Taber's Cyclopedic Medical Dictionary and other even more esoteric interpretive aids, the Court has now waded through *Risk*. It is not the function of the judiciary to grade the social or artistic merits of speech. *Salomone v. MacMillan Pub. Co.*, 97 Misc.2d 346, 351, 411 N.Y.S.2d 105, 109–10 (1978), *rev'd on other grounds*, 77 A.D.2d 501, 429 N.Y.S.2d 441 (1980). Then too, the skills which go with law and lawyering do not readily lend themselves to critiquing studies such as this in any event. It seems noteworthy, however, that nowhere between the covers of *Risk* is there a red delicious apple emblazoned with a skull and crossbones. Nowhere is the reader advised that the active carcinogenic agent in Alar happens to also be a rocket fuel.[1] This is not a polemical tract preying on raw emotions and irrational fears. The terminology employed and mode of presentation suggest that *Risk* was not even directed to the general public, but to Congress, the Administration and the scientific/environmental community. There are no theatrics, no histrionic expressions of outrage and no visual or auditory hyperbole.

That is not to say that NRDC does not have an agenda or that the nature of the agenda does not shine through. Nor is to say that Alar is not a focal point in the study, giving rise, as it allegedly does, to 86–96% of the total risk posed by the eight carcinogenic pesticides examined.[2] *Risk* at 37. But it is to say that *Risk* is a dry compilation of asserted facts, data and extrapolations dealing with twenty-seven different agricultural crops and twenty-three different chemicals commonly applied to those crops.[3] As it relates to apples, *Risk*

---

1. Which, oddly enough, is true. *White v. Uniroyal, Inc.*, 155 Cal.App.3d 1, 11–12, 202 Cal. Rptr. 141, 146 (1984); *United Aircraft Corp. v. Paul Hardeman, Inc.*, 8 Storey 66, 58 Del. 66, 68 n. 1, 204 A.2d 396, 397 n. 1 (Del.Super.1964).

2. Assuming the validity of the upper end of the spectrum, 74% of the Alar in the system is attributable to apples and about 20% to cherries. *Risk* at 37.

3. The study deals with two broad perils: carcinogens and neurotoxins. Only the former relates to apples in a significant manner. Tomatoes, green beans and orange juice all account for more neurotoxins than do apples which, along with cucumbers, rank near the bottom of the list as responsible for only about 5% of the danger. *Risk* at 48.

is in large measure premised on Uniroyal's own market-basket and carcinogenicity studies conducted in response to an EPA directive issued in 1984. *Id.* at 37 & 79. *See generally, Nader v. United States E.P.A.,* 859 F.2d 747, 749–50 (9th Cir.1988), *cert. denied,* 490 U.S. 1034, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989) (administrative history of Alar controversy).

The central premise of *Risk* is that governmental methodology fails to take into consideration the distinct hazards faced by preschoolers. This segment of the population is alleged to face heightened dangers due to a variety of factors. Preschoolers as a class consume more food per unit of body weight than does the adult population due to higher metabolic activity which in turn means increased caloric requirements. *Risk* at 23–24. They also demonstrate a greater propensity for consumption of fruit. *Id.* at 24–27. These two features taken together translate into an inverse correlation between age and exposure to pesticides. *Id.* at 28–30.

Moreover, a young child's immature physiology is such that absorption is increased and excretion decreased. *Id.* at 55–56. Autodetoxification defenses are not developed. *Id.* at 56. The explosive rate at which a youngster progresses from a zygote of infinitesimal mass to a five-year-old forty pounder renders DNA/mutagen coupling more likely and self-repair less so. *Id.* at 57–63. Then there is the latency feature. *Id.* at 63. If a primary carcinogen requires an incubation period of twenty years to result in active cancer, an individual seventy years old may consume it by the bushel full with a certain degree of confidence that he or she will probably expire from other causes. A five-year-old lacks the same luxury.

Assuming the accuracy of these postulations, the government is in grievous error when allowable exposures are calculated based on probable life-time contact without regard for the age at which exposure occurs. *Id.* at 80. Serious consequences develop during the first several years of life, and what an adult might be able to safely tolerate has no bearing on the quantity or type of hazardous chemicals which a toddler can handle without adverse effects. *Id.* Of at least equal concern to *Risk* is EPA's laggardly willingness to develop testing procedures to determine the long range impact of chronic exposure to neurotoxins. *Id.* at 81–82. That organophosphate pesticides and other neurotoxins affect behavior and impair learning abilities is known. *Id.* Unknown, however, are the tolerable limits for developing preschoolers. Then too is the criticism that EPA has no program in place to test "inert" fillers which, although inert so far as pests and weeds are concerned, are active carcinogens when ingested by humans. *Id.* at 49 & 81. Also taken to task is the FDA which has a history of inadequate inspections accompanied by often incomplete testing procedures and failure to follow through to insure that violative products, when found, do not nonetheless wend their way to market. *Id.* at 92–94.

This summary book review is what *Risk* is all about. Apple growers might well wish it had not seen the light of day, but so would the producers of twenty-six other agricultural crops as would the manufacturers of the twenty-three pesticides referenced. Even EPA and FDA might not appreciate outside meddling in how the agencies conduct their business. What *Risk* is not about, however, is apples per se.

Nor are apple growers condemned. *Risk* appreciates that the agricultural industry must make a profit in order to ensure a dependable mass supply of food, and understands further that were growers compelled to rely less intensively on chemicals, economic dislocations would occur, most often at the expense of the smaller producer. *Id.* at 95. The solution, according to NRDC, is for government to fashion carrots and sticks to encourage a voluntary movement away from heavy use of pesticides, for example: (1) the imposition of taxes on hazardous chemicals coupled with credit/subsidy/insurance programs designed to promote non-chemical means of pest, weed and fungus control (*id.* at 95–96); and (2) the removal of artificial barriers which now render organic farming

methods financially unattractive.[4] *Id.* at 96.

*Risk* is not about apples.[5] It is not about the State of Washington.[6] It is about children and pesticides. *California Canners & Growers Ass'n v. United States,* 7 Cl.Ct. 69, 118 (1984). Perhaps more pointedly, it is about governmental failure to quantify the prevailing intake of preschool children of discrete fruits and vegetables based on current dietary data and to take such consumption into account in rendering registration/cancellation decisions. The typical consumer perusing *Risk* would have two reactions. First, what do all those two dollar words mean? Second, the use of pesticides is a topic responsible officials should be thinking about.

Unlike the "60 Minutes" message, there is no hint that every apple in the country is dangerous. On the contrary, *Risk* recognizes that Alar usage had been receding as of late and that assuming maximum application rates, perhaps only 10–11% of the 1988 domestic production was treated with Alar.[7] *Risk* at 38. While it cannot be gainsaid that Alar (and thus apples) played a role in the message, the scope of *Risk* is far broader. It would take a chef of no small talent to put together a palatable meal without utilizing at least one of the twenty-seven fruits and vegetables addressed. Simply put, if *Risk* disparages at all, it disparages the "whole world," or at least the whole agricultural world.[8]

Nor did NRDC criticize apples during the broadcast. Ms. Hathaway appeared in several short bits. During one, she expressed concern over eight unidentified carcinogenic substances, only half of which have anything to do with apples. See *Id.* at 41–42. During another, she did focus on Alar, but her criticism was directed to EPA inaction, not apples.

It is true that *Risk* could theoretically provide the fodder for an assault on Washington apples were some other publisher to extrapolate data and conclusions contained therein and refocus them toward the apple industry. That is in fact what happened. The Court is aware of no case law, however, which suggests that a publication not "of and concerning" an identifiable target can be converted into an "of and concerning" attack due to the actions of third parties.

The assumptions, data and methodology employed by *Risk* may be flawed. The conclusions reached may or may not be erroneous. The underlying studies may or may not have been discredited. There is no need to consider the substantive elements of a disparagement claim, however, for plaintiffs fail the threshold requirement of demonstrating standing. *Barger v. Playboy Enterprises, Inc.,* 564 F.Supp. 1151, 1153 (N.D.Cal.1983), *aff'd,* 732 F.2d 163 (9th Cir.1984), *cert. denied,* 469 U.S. 853, 105 S.Ct. 175, 83 L.Ed.2d 110 (1984). It is true that a publisher may not insulate ac-

---

4. A grower who does not use pesticides may find crop insurance unavailable. *Id.* at 96. A farmer who practices rotation may become ineligible for commodity support payments. *Id.* A grower who fails to strive for chemically-enhanced cosmetic appearance may find his crop down-graded. *Id.* at 96–97.

5. Producers other than apple growers might have cause to feel put upon. Strawberries, peaches, celery, cherries, cucumbers, peppers, tomatoes, sweet potatoes, grapes, cantaloupes and lettuce are all more likely than apples to contain residual pesticides. *Risk* at 27.

6. Only a handful of states are specifically referenced, including Texas, Vermont, California, Minnesota and Connecticut. Of these only Vermont, where Alar usage is estimated at 23% of acreage under production, is singled out for critical comment. *Risk* at 3.

7. If that be true, then why were apple juice samples testing as high as 70% positive for Alar? Because a significant part of the problem lies in importation from countries where Alar is widely used. *Risk* at 38. Then too, both common sense and the law of diffusion tell us that if a juice manufacturer runs a batch using apples which are 99% Alar-free, the 1% which are not will result in 100% of the juice being contaminated by at least trace quantities.

8. The study was directed specifically only to fruits and vegetables. Mentioned in passing, however, was the pesticide residuals commonly found in meat, eggs and dairy products, and in the ground water of twenty-six states. *Id.* at 49–52. More than 20% of the wells surveyed in a California study tested positive for pesticides. *Id.* at 49.

tionable derogatory material by the mere expedient of burying it within a cloak of nonactionable material. See *Pring v. Penthouse Intern. Ltd.*, 695 F.2d 438, 443–44 (10th Cir.1982) (Breitenstein, J., dissenting), *cert. denied,* 462 U.S. 1132, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983). This seems a classic case, however, where the subject matter is so wide-ranging and the indictment so all-embracive that the resultant dilution precludes a finding that *Risk* was "of and concerning" either these plaintiffs or their products. See Order entered June 5, 1992, 800 F.Supp. 928, 936.

By letter dated June 12, 1992 plaintiffs' counsel indicated that he is renewing a motion for leave to amend and wishes the amended complaint considered in disposing of the instant motion. That places the cart before the horse. The motion to amend was previously scheduled for hearing concurrently with defense motions for summary judgment and was withdrawn toward the close of argument. The time to have argued the motion was when counsel were all gathered in Spokane from far flung reaches including Seattle, San Francisco, New York and Washington, D.C. While leave to amend is freely granted, the extent to which amendment would prove futile in any event is subject to hot debate. The Court has no intention of relying on an unfiled complaint in disposing of a ripe motion or of delaying ruling until the amendment issue is resolved. The intent, rather, is to move this action along just as expeditiously as due process will allow. Summary judgment is not being granted on the basis of a failure to state a claim or on the basis of lack of evidential support. It is being granted based on lack of standing, and it is most unlikely that pleading refinements would alter the bottom line. Having said that much, if leave to amend is granted, and if such amendment as may be allowed would be material to the instant motion, plaintiffs will be deemed to have a motion to reconsider in place.

THEREFORE IT IS ORDERED that:

(1) The motion of NRDC and Fenton Communications for summary judgment is GRANTED. *CR 72.*

(2) It has come to the Court's attention that the complaint names "John Does 1–50." Doe pleading is not permitted in the federal system unless the existence of the actor is already known and only his identity remains to be ascertained. *Productions & Leasing v. Hotel Conquistador,* 573 F.Supp. 717, 725 (D.Nev.1982), *aff'd,* 709 F.2d 21 (1983). The complaint merely suggests that additional culpable actors "may" be found as discovery proceeds. That is insufficient to trigger the exception. Accordingly, John Does 1–50 are DISMISSED.