67 F.3d 816
 23 Media L. Rep. 2454, 95 Cal. Daily Op. Serv. 7691,
95 Daily Journal D.A.R. 13,163
 Grady AUVIL and Lillie Auvil, husband and wife; Robert
Bernath and Cathy Bernath, husband and wife; Robert Brody
and Charlotte Brody, husband and wife; Burt Chestnut and
Elly Chestnut, husband and wife; Harold Cox and Lorraine
Cox, husband and wife; Ferrell Deen and Peggy Deen, husband
and wife; Charles Drake and Maxine Drake, d/b/a Frosty Red
Orchard, Inc., husband and wife; James Eddie, d/b/a Eddie
Farms, Inc.; Paul Hudson, a marriedman on behalf of his
separate property; Bert Stennes and Evelyn Stennes, husband
and wife, d/b/a Squaw Creek Ranch, Inc.; Norman Wilson and
Wanda Wilson, husband and wife, Plaintiffs-Appellants,
v.
CBS "60 MINUTES", a foreign corporation; Columbia
Broadcasting System (CBS), a foreign corporation; Retlaw
Enterprises, Inc., a corporation, d/b/a KIMA Television;
Bonneville International Corporation, a corporation, d/b/a
Kiro Television; King Broadcasting Company, a corporation,
d/b/a KREM Television, Defendants-Appellees.
 No. 93-35963.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 7, 1994.
Decided Oct. 2, 1995.
 
 Scott A. Jonsson, Peter A. Ozanne, Mildred J. Carmack, Steve C. Morasch, Schwabe, Williamson & Wyatt, Portland, Oregon, for plaintiffs-appellants.
 P. Cameron DeVore, Bruce E.H. Johnson, Christopher Pesce, William C. Komaroff, Davis Wright Tremaine, Seattle, Washington, and Douglas P. Jacobs, Susanna M. Lowy, Anthony M. Bongiorno, CBS Inc., New York City, for defendants-appellees.
 Richard A. Samp, Washington Legal Foundation, Washington, DC, for amicus Washington Legal Foundation.
 Lee Levine, Ross, Dixon & Masback, Washington, DC, for amicus Capital Cities, et al.
 Michael B. Trister, Lichtman, Trister, Singer & Ross, Washington, DC, for amicus J. Routt Reigart, M.D.
 Frederick A.O. Schwarz, Jr., Cravath, Swaine & Moore, New York City, for amicus National Wildlife Federation, et al.
 Appeal from the United States District Court for the Eastern District of Washington.
 Before: WOOD, Jr.* , HUG, and PREGERSON,** Circuit Judges.
 PER CURIAM:
 
 
 1
 Grady and Lillie Auvil et al., suing on behalf of themselves and other similarly situated Washington State apple growers ("growers"), appeal from the district court's summary judgment in favor of CBS "60 Minutes" ("CBS"). The district court held that the growers failed to prove the falsity of the message conveyed by the "60 Minutes" broadcast of " 'A' is for Apple," which concerned the use of Alar, a chemical sprayed on apples.[1] We have jurisdiction under 28 U.S.C. Sec. 1291, and we affirm because we agree that the growers have failed to raise a genuine issue of material fact as to the falsity of the broadcast.
 
 BACKGROUND
 
 2
 On February 26, 1989, CBS's weekly news show "60 Minutes" aired a segment on daminozide, a chemical growth regulator sprayed on apples. The broadcast, entitled " 'A' is for Apple," also addressed the slow pace of government efforts to recall the chemical. The broadcast was based largely on a Natural Resources Defense Council ("NRDC") report, entitled Intolerable Risk: Pesticides in Our Children's Food ("Intolerable Risk "), which outlined health risks associated with the use of a number of pesticides on fruit, especially the risks to children. " 'A' is for Apple" focused on the NRDC report's findings concerning daminozide, as well as the EPA's knowledge of daminozide's carcinogenity. Scientific research had indicated that daminozide, more commonly known by its trade name, Alar, breaks down into unsymmetrical dimethylhydrazine (UDMH), a carcinogen.[2]
 
 
 3
 The segment opened with the following capsule summary from Ed Bradley, a "60 Minutes" commentator:
 
 
 4
 The most potent cancer-causing agent in our food supply is a substance sprayed on apples to keep them on the trees longer and make them look better. That's the conclusion of a number of scientific experts. And who is most at risk? Children, who may someday develop cancer from this one chemical called daminozide. Daminozide, which has been sprayed on apples for more than 20 years, breaks down into another chemical called UDMH.
 
 
 5
 During the broadcast, Bradley garnered a number of viewpoints on the Alar issue. Those interviewed included an Environmental Protection Agency ("EPA") administrator, an NRDC attorney, a U.S. congressman, a professor of pediatrics at Harvard Medical School, and a scientist from the Consumers Union, which publishes Consumer Reports magazine. After Bradley's opening synopsis, the broadcast segment began with the EPA administrator's admission that the EPA had known of cancer risks associated with daminozide for sixteen years, but that EPA regulations had hampered the removal of the chemical from the market. The U.S. Congressman rejected the EPA administrator's explanation that the laws were to blame for the EPA's hesitation. He thought that it was well within the EPA's power to remove daminozide from the market, and that the EPA's reluctance stemmed from its fear that Uniroyal, the company that manufactured daminozide, would sue the EPA. The broadcast segment continued with testimonials from the NRDC attorney, who discussed the findings published in Intolerable Risk, focusing on the cancer risks to children from ingestion of apples treated with daminozide. The NRDC's findings were corroborated both by the EPA administrator and the Harvard pediatrician. The broadcast ended with the statements of a Consumers Union scientist, who revealed that most manufacturers of apple products said they no longer use apples treated with daminozide but that the manufacturers were unsuccessful in keeping daminozide completely out of their products.
 
 
 6
 Following the "60 Minutes" broadcast, consumer demand for apples and apple products decreased dramatically. The apple growers and others dependent upon apple production lost millions of dollars. Many of the growers lost their homes and livelihoods.
 
 
 7
 In November 1990, eleven Washington State apple growers, representing some 4,700 growers in the Washington area, filed a complaint in Washington State Superior Court against CBS, local CBS affiliates, the NRDC, and Fenton Communications, Inc., a public relations firm used by the NRDC in 1989. The growers asserted, among others, a claim for product disparagement.
 
 
 8
 In December 1990, CBS removed the cause to the United States District Court for the Eastern District of Washington on diversity grounds. The growers moved to remand to state court. The district court denied the growers' motion to remand and dismissed their claims against CBS's local affiliates. Auvil v. CBS "60 Minutes", 800 F.Supp. 928 (E.D.Wash.1992) ("Auvil I ").[3] In addition, the court denied CBS's motion to dismiss or for summary judgment on the issue of whether the television broadcast was "of and concerning" the apple growers or their products. Id. The district court dismissed CBS's argument on the ground that, because all apples were identified as dangerous, the growers could bring suit for the disparagement of their product. Id. at 932-935.[4]
 
 
 9
 After discovery, which was limited to the question of the falsity of the CBS broadcast, the growers moved to strike the opinions of CBS's expert witnesses and also for partial summary judgment on the question of falsity. CBS also moved for summary judgment on the question of falsity. The district court denied the growers' motions but granted summary judgment to CBS because the growers did not produce evidence sufficient to create a triable issue of fact as to the falsity of the broadcast. Auvil v. CBS "60 Minutes", 836 F.Supp. 740 (E.D.Wash.1993) ("Auvil III "). The growers appeal the district court's summary judgment ruling that they failed to offer evidence sufficient to present a genuine issue of fact for trial on the falsity of the CBS broadcast.
 
 DISCUSSION
 
 10
 We review the district court's summary judgment ruling de novo. Unelko Corp. v. Rooney, 912 F.2d 1049, 1052 (9th Cir.1990), cert. denied, 499 U.S. 961, 111 S.Ct. 1586, 113 L.Ed.2d 650 (1991). To survive CBS's motion for summary judgment, the growers must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). There is no issue for trial unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id. at 249, 106 S.Ct. at 2511 (citations omitted). Thus, while they need not definitively prove the falsity of statements made during the CBS broadcast, "[t]he mere existence of a scintilla of evidence in support of the [growers'] position will be insufficient; there must be evidence on which the jury could reasonably find for the [growers]." Id. 477 U.S. at 252, 106 S.Ct. at 2512. Our inquiry, therefore, asks whether reasonable jurors could find that the growers are entitled to a verdict--"whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Id. (citation omitted).[5]
 
 
 11
 Although there are no Washington state cases dealing directly with a product disparagement cause of action, a Washington state appellate court, citing the Restatement of Torts, recognized that those whose products are disparaged face a higher burden of proof than do defamation plaintiffs. See Waechter v. Carnation Co., 5 Wash.App. 121, 485 P.2d 1000, 1003-04 (1971). We assume, therefore, that Washington recognizes product disparagement causes of action. We also look to the Restatement, as did the Washington court, for guidance regarding applicable standards.
 
 
 12
 To establish a claim of product disparagement, also known as trade libel, a plaintiff must allege that the defendant published a knowingly false statement harmful to the interests of another and intended such publication to harm the plaintiff's pecuniary interests. Restatement (Second) of Torts Sec. 623A. Accordingly, for a product disparagement claim to be actionable, the plaintiff must prove, inter alia, the falsity of the disparaging statements. See Restatement (Second) of Torts Secs. 623A, 651(1)(c).
 
 
 13
 Existing case law on product disparagement provides little guidance on the falsity prong. Nonetheless, as a tort whose actionability depends on the existence of disparaging speech, the tort is substantively similar to defamation. Therefore, we reference defamation cases to arrive at a decision in the instant matter.
 
 
 14
 " 'A' is for Apple" was based on Intolerable Risk, a scientific report disseminated by the NRDC. The report discussed the findings of cancer research studies on various chemicals used on fruit and questioned the EPA's hesitance in removing Alar from the market.[6] The broadcast contained a number of factual assertions, several of which are pointed out by the growers to support their claim that the broadcast falsely disparaged their product.[7]
 
 
 15
 On the subject of daminozide's cancer-causing potential, the growers point to the following statements:
 
 
 16
 The most potent cancer-causing agent in our food supply is a substance sprayed on apples to keep them on the trees longer and make them look better.
 
 
 17
 We know that [daminozide and other chemicals] do cause cancer.
 
 
 18
 Just from these eight pesticides, what we're finding is that the risk of developing cancer is approximately 250 times what EPA says is an acceptable level of cancer in our population.
 
 
 19
 [The EPA administrator] took another look at the evidence and decided to start the process of banning daminozide after all. But the process could take five years. So we returned to Washington to ask him why he doesn't just declare daminozide an imminent hazard, and suspend it right away....
 
 
 20
 The growers offered evidence showing that no studies have been conducted to test the relationship between ingestion of daminozide and incidence of cancer in humans. Such evidence, however, is insufficient to show a genuine issue for trial regarding the broadcast's assertions that daminozide is a potent carcinogen. Animal laboratory tests are a legitimate means for assessing cancer risks to humans. See Environmental Defense Fund v. EPA, 548 F.2d 998, 1006 (D.C.Cir.1976) (recognizing that EPA relies on animal test data to evaluate human cancer risks), cert. denied sub nom., Velsicol Chem. Corp. v. EPA, 431 U.S. 925, 97 S.Ct. 2199, 53 L.Ed.2d 239 (1977); Villari v. Terminix Int'l, Inc., 692 F.Supp. 568, 570 (E.D.Pa.1988) (acknowledging that "animal studies are routinely relied upon by the scientific community in assessing the carcinogenic effects of chemicals on humans").
 
 
 21
 The growers provide no other challenge to the EPA's findings, nor do they directly attack the validity of the scientific studies. All of the statements referenced above are factual assertions made by the interviewees, based on the scientific findings of the NRDC. These findings were corroborated by the EPA administrator and a Harvard pediatrician. The EPA, which often relies on the results of animal studies, acknowledged that it knew of the cancer risks associated with ingestion of daminozide and, in August 1985, classified daminozide as a "probable human carcinogen." Indeed, the EPA estimated that the dietary risk to the general population from UDMH, a metabolite of daminozide, was fifty times an acceptable risk and ultimately concluded that daminozide posed an unreasonable risk to the general population. See generally 57 Fed.Reg. 46436, 46437-46440 (1992).[8]
 
 
 22
 The growers' only challenge to the scientific studies is their claim that animal studies cannot be relied on to indicate cancer risk for humans. Because animal studies can be relied upon, their evidence that no studies have been conducted on the effects of daminozide on humans does not create a genuine issue for trial on the falsity of the broadcast's assertions regarding daminozide's carcinogenicity.
 
 
 23
 On the subject of cancer risks to children from the use of daminozide on apples, the growers point to the following factual assertions to support their falsity claim:
 
 
 24
 What we're talking about is a cancer-causing agent used on food that EPA knows is going to cause cancer for thousands of children over their lifetime.
 
 
 25
 [T]he Natural Resources Defense Council[ ] has completed the most careful study yet on the effect of daminozide and seven other cancer-causing pesticides on the food children eat.
 
 
 26
 [O]ver a lifetime, one child out of every 4,000 or so of our preschoolers will develop cancer just from these eight pesticides.
 
 
 27
 [The NRDC study] says children are being exposed to a pesticide risk several hundred times greater than what the agency says is acceptable.
 
 
 28
 The growers offered evidence showing that no scientific study has been conducted on cancer risks to children from the use of pesticides. However, CBS based its statements regarding cancer and children on the NRDC's findings that the daminozide found on apples is more harmful to children because they ingest more apple products per unit of body weight than do adults. The growers have provided no affirmative evidence that daminozide does not pose a risk to children. The fact that there have been no studies conducted specifically on the cancer risks to children from daminozide does nothing to disprove the conclusion that, if children consume more of a carcinogenic substance than do adults, they are at higher risk for contracting cancer. The growers' evidence, therefore, does not create a genuine issue as to the falsity of the broadcast's assertion that daminozide is more harmful to children.
 
 
 29
 Despite their inability to prove that statements made during the broadcast were false, the growers assert that summary judgment for CBS was improper because a jury could find that the broadcast contained a provably false message, viewing the broadcast segment in its entirety. They further argue that, if they can prove the falsity of this implied message, they have satisfied their burden of proving falsity.
 
 
 30
 The growers' contentions are unavailing. Their attempt to derive a specific, implied message from the broadcast as a whole and to prove the falsity of that overall message is unprecedented and inconsistent with Washington law. No Washington court has held that the analysis of falsity proceeds from an implied, disparaging message. It is the statements themselves that are of primary concern in the analysis.[9] For example, in Lee v. Columbian, Inc., 64 Wash.App. 534, 826 P.2d 217 (1991), the plaintiff brought a defamation suit against a newspaper, claiming that the headline and lead sentence of a newspaper article defamed him.[10] He conceded that both statements were true on their face; nevertheless, he argued that the statements were false and capable of defamatory meaning. Lee, 826 P.2d at 219. He contended that "using irony and innuendo, the headline and lead sentence both strongly implied that Plaintiff was using a tax loophole to improperly reduce his taxes." Id. The Washington Court of Appeals found the plaintiff's argument to be meritless because
 
 
 31
 [d]efamatory meaning may not be imputed to true statements. The defamatory character of the language must be apparent from the words themselves. Washington courts are "bound to invest words with their natural and obvious meaning and may not extend language by innuendo or by the conclusions of the pleader."
 
 
 32
 Id. (citing Sims v. KIRO, Inc., 20 Wash.App. 229, 580 P.2d 642, 645 (1978), cert. denied, 441 U.S. 945, 99 S.Ct. 2164, 60 L.Ed.2d 1047 (1979)).
 
 
 33
 The Washington courts' view finds support in the Restatement, which instructs that a product disparagement plaintiff has the burden of proving the "falsity of the statement." Restatement (Second) of Torts Sec. 651(1)(c) (emphasis added). This standard refers to individual statements and not to any overall message. Therefore, we must reject the growers' invitation to infer an overall message from the broadcast and determine whether that message is false.
 
 
 34
 We also note that, if we were to accept the growers' argument, plaintiffs bringing suit based on disparaging speech would escape summary judgment merely by arguing, as the growers have, that a jury should be allowed to determine both the overall message of a broadcast and whether that overall message is false. Because a broadcast could be interpreted in numerous, nuanced ways, a great deal of uncertainty would arise as to the message conveyed by the broadcast. Such uncertainty would make it difficult for broadcasters to predict whether their work would subject them to tort liability. Furthermore, such uncertainty raises the spectre of a chilling effect on speech.[11]CONCLUSION
 
 
 35
 Because the growers have failed to raise a genuine issue of material fact regarding the falsity of statements made during the broadcast of " 'A' is for Apple," the district court's decision granting CBS's motion for summary judgment is
 
 
 36
 AFFIRMED.
 
 
 
 *
 Honorable Harlington Wood, Jr., Senior United States Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 **
 Judge Tang was originally a member of this panel and heard argument in this case. Judge Tang died prior to circulation of this opinion, and pursuant to General Order 3.2(g), Judge Pregerson was drawn as a replacement. Judge Pregerson was furnished with a tape of the oral argument as well as the briefs and other materials received by the other members of the panel
 
 
 [1]
 A transcript of the broadcast at issue in this case is reprinted in an appendix to the lower court opinion. See Auvil v. CBS "60 Minutes", 800 F.Supp. 928, 937 (E.D.Wash.1992)
 
 
 [2]
 Alar cannot be removed either by washing the fruit or peeling it. In addition, the substance remains in the flesh of the apple and, as a result, can be found in processed apple products, including apple juice and applesauce
 
 
 [3]
 In a separate order, the district court dismissed the growers' claims against the NRDC and Fenton Communications. Auvil v. CBS "60 Minutes", 800 F.Supp. 941 (E.D.Wash.1992) ("Auvil II ")
 
 
 [4]
 Applicability of the "of and concerning" requirement to product disparagement law is raised on appeal. We need not decide this issue, however, because we agree that, regardless of whether the broadcast was "of and concerning" their product, the growers cannot show falsity
 
 
 [5]
 The Washington courts have not answered directly the question of whether to use a preponderance of the evidence or convincing clarity standard of proof in proving falsity. Compare Haueter v. Cowles Pub. Co., 61 Wash.App. 572, 811 P.2d 231 (1991) (preponderance of the evidence standard) with Herron v. King Broadcasting Co., 112 Wash.2d 762, 776 P.2d 98 (1989) (clear and convincing standard). We do not decide which standard should be used in this context because we find that the growers failed to meet the more generous preponderance of the evidence standard in proving the falsity of the CBS broadcast
 
 
 [6]
 Neither party disputes that the broadcast disparaged apples. The broadcast communicated that daminozide is a potent human carcinogen that poses a significant risk to children. Because the broadcast focused on the use of daminozide on apples, the disparaging statements made during the broadcast about daminozide reflect negatively on apples
 
 
 [7]
 The statements we recite herein were taken from the growers' briefs. See Appellants' Brief at 7, 8; Appellants' Reply Brief at 13
 
 
 [8]
 We find it worth noting that on February 1, 1989, the EPA announced that it had started proceedings to remove Alar from the market because of preliminary findings, based on laboratory tests on animals, that the chemical posed a risk of cancer to humans. A few months later, Uniroyal, the manufacturer of daminozide, voluntarily requested a withdrawal of daminozide's food use registrations. The EPA later canceled all food use registrations for daminozide in November 1989. See 54 Fed.Reg. 47492 (1992)
 
 
 [9]
 We note that CBS does not dispute the growers' reliance on an overall message. CBS merely argues that we need not adopt the growers' view of the message of the broadcast. However, CBS confuses the notion that a specific message can be considered in an overall context with the notion that we should analyze the falsity of an overall message
 
 
 [10]
 The headline of the article stated, "Cardroom parking fees reduce taxes." The article began with the following lead sentence:
 Darrell Lee, a high-profile attorney and enterprising poker promoter, has devised an unusual way to reduce his taxes and stay within the letter of the law on gambling activity at his two La Center cardrooms.
 
 
 [11]
 There is an additional problem with the growers' arguments: their approach allows disparagement plaintiffs to construct an overall message that lends itself easily to proof of falsity. The instant case provides a cogent example. Rather than proving the falsity of statements made during " 'A' is for Apple" by challenging the studies upon which factual assertions made during the broadcast were based, the growers request that we analyze the message that the studies conclusively show that apples cause cancer in humans. Accordingly, the growers offered evidence that the studies are not conclusive, that there are no studies tracing the specific link between ingestion of daminozide and incidence of cancer in humans. It is considerably easier to prove the falsity of an assertion that studies are conclusive, rather than to prove the falsity of the studies themselves